# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 16, 2018         Decided August 17, 2018

No. 17-1155

AIR ALLIANCE HOUSTON, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND ANDREW
WHEELER, ACTING ADMINISTRATOR, U.S. ENVIRONMENTAL
PROTECTION AGENCY,
RESPONDENTS

UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION, AFL-CIO-CLC, ET AL.,
INTERVENORS

———

Consolidated with 17-1181

———

On Petitions for Review of a Final Rule of the
United States Environmental Protection Agency

———

*Steven C. Wu*, Deputy Solicitor General, Office of the Attorney General for the State of New York, argued the cause for State Petitioners. With him on the briefs were *Eric T. Schneiderman*, Attorney General, *Barbara D. Underwood*, Solicitor General, *David S. Frankel*, Assistant Solicitor General, *Michael J. Myers*, Assistant Attorney General, *Ellen F. Rosenblum*, Attorney General, Office of the Attorney General for the State of Oregon, *Paul Garrahan*, Attorney-in-Charge, *Peter F. Kilmartin*, Attorney General, Office of the Attorney General for the State of Rhode Island, *Gregory S. Schultz*, Special Assistant Attorney General, *Thomas J. Donovan*, *Jr.*, Attorney General, Office of the Attorney General for the State of Vermont, *Nicholas F. Persampieri*, Assistant Attorney General, *Lisa Madigan*, Attorney General, Office of the Attorney General for the State of Illinois, *Matthew J. Dunn*, *Gerald T. Karr*, *James P. Gignac*, Assistant Attorneys General, *Tom Miller*, Attorney General, Office of the Attorney General for the State of Iowa, *Jacob Larson*, Assistant Attorney General, *Janet T. Mills*, Attorney General, Office of the Attorney General for the State of Maine, *Gerald D. Reid*, Natural Resources Division Chief, *Robert W. Ferguson*, Attorney General, Office of the Attorney General for the State of Washington, *William R. Sherman*, Assistant Attorney General, *Brian E. Frosh*, Attorney General, Office of the Attorney General for the State of Maryland, *Steven M. Sullivan*, Solicitor General, *Maura Healey*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Christophe Courchesne*, Assistant Attorney General, *Hector H. Balderas*, Attorney General, Office of the Attorney General for the State of New Mexico, and *William Grantham*, Assistant Attorney General.

*Emma C. Cheuse* and *Susan J. Eckert* argued the cause for Community Petitioners and Petitioner-Intervenor. With them

on the briefs were *Gordon E. Sommers* and *Joseph M. Santarella*, *Jr*.

*Scott L. Nelson* and *Allison M. Zieve* were on the brief for *amici curiae* Former Regulatory Officials in support of petitioners and vacatur.

*Richard L. Revesz*, *Bethany A. Davis Noll*, *Denise A. Grab*, and *Jason A. Schwartz* were on the brief for *amicus curiae* Institute for Policy Integrity at New York University School of Law in support of petitioners.

*Jonathan Brightbill*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for respondents. With him on the brief were *Jeffrey H. Wood*, Acting Assistant Attorney General, *Stephanie J. Talbert*, Attorney, and *Brian Doster*, Assistant General Counsel, U.S. Environmental Protection Agency.

*Shannon S. Broome* argued the cause for intervenor Chemical Safety Advocacy Group, et al. With her on the brief were *C. Frederick Beckner III*, *Justin A. Savage*, *Ryan C. Morris*, *Kurt A. Johnson*, *Charles H. Knauss*, *Peter Tolsdorf*, *Steven P. Lehotsky*, *Michael B. Schon*, *Leslie A. Hulse*, and *Richard S. Moskowitz*.

*Elizabeth B. Murrill*, Solicitor General, Office of the Attorney General for the State of Louisiana, argued the cause for intervenor State of Louisiana. With her on the brief were *Jeff Landry*, Attorney General, *Michelle M. White*, Assistant Solicitor General, *Leslie Rutledge*, Attorney General, Office of the Attorney General for the State of Arkansas, *Lee Rudofsky*, Solicitor General, *Nicholas J. Bronni*, Deputy Solicitor General, *Derek Schmidt*, Attorney General, Office of the Attorney General for the State of Kansas, *Jeffrey A. Chanay*,

Chief Deputy Attorney General, *Bryan C. Clark*, Assistant Solicitor General, *Mark Brnovich*, Attorney General, Office of the Attorney General for the State of Arizona, *Dominic E. Draye*, Solicitor General, *Pamela Jo Bondi*, Attorney General, Office of the Attorney General for the State of Florida, *Edward M. Wenger*, Chief Deputy Solicitor General, *Mike Hunter*, Attorney General, Office of the Attorney General for the State of Oklahoma, *Mithun Maninghani*, Solicitor General, *Ken Paxton*, Attorney General, Office of the Attorney General of the State of Texas, *Scott A. Keller*, Solicitor General, *Patrick Morrisey*, Attorney General, Office of the Attorney General for the State of West Virginia, *Erica N. Peterson*, Deputy Solicitor General, *S. Chad Meredith*, Deputy General Counsel, Office of the Attorney General for the Commonwealth of Kentucky, *Alan Wilson*, Attorney General, Office of the Attorney General for the State of South Carolina, *James Emory Smith*, *Jr.*, Deputy Solicitor General, *Sean Reyes*, Attorney General, Office of the Attorney General for the State of Utah, *Tyler R. Green*, Solicitor General, *Brad Schimel*, Attorney General, Office of the Attorney General for the State of Wisconsin, and *Misha Tseytlin*, Solicitor General. *Paul A. Martin*, Chief Deputy Attorney General, Office of the Attorney General for the State of West Virginia, *Harry J. Vorhoff*, Assistant Attorney General, Office of the Attorney General for the State of Louisiana, and *Jonathan L. Williams* entered appearances.

Before: ROGERS, KAVANAUGH[*] and WILKINS, *Circuit Judges*.

Opinion for the court filed PER CURIAM.

---

[*] Judge Kavanaugh was a member of the panel at the time the case was argued but did not participate in this opinion.

5

PER CURIAM: This appeal presents the question whether the Environmental Protection Agency ("EPA") had authority under Sections 307(d)(7)(B) and 112(r)(7) of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7607(d)(7)(B), 7412(r)(7), to delay the effective date of the Chemical Disaster Rule of January 13, 2017, for twenty months for the purpose of reconsideration, and, if so, whether it properly exercised that authority. We hold that where EPA has exercised its Section 7607(d)(7)(B) authority to delay the effectiveness of a final rule, it cannot avoid that statute's express limitations by invoking general rulemaking authority under a different statutory provision. EPA's action was arbitrary and capricious in any event. Accordingly, we vacate the Delay Rule of June 14, 2017.

## I.

### A.

In 1990, Congress amended the CAA, and addressed among other things multiple high-profile chemical accidents that harmed workers, local communities, and the environment. *See* 136 CONG. REC. S16,899, S16,926–27 (1990) (Conf. Rep.). Section 112(r) of the 1990 Amendments, "Prevention of Accidental Releases," provides that "[i]t shall be the objective of the regulations and programs authorized under this subsection to prevent the accidental release and to minimize the consequences of any such release of any [listed substance] or any other extremely hazardous substance." 42 U.S.C. § 7412(r)(1). "Accidental release" is defined as "an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source." *Id.* § 7412(r)(2)(A). Congress also established the Chemical Safety Board ("CSB") to investigate major accidental releases and issue reports to EPA "recommending measures to reduce the likelihood or the

consequences of accidental releases and proposing corrective steps to make chemical [industrial processes] as safe and free from risk of injury as is possible." *Id.* § 7412(r)(6)(C)(ii). "Whenever the [CSB] submits a recommendation with respect to accidental releases to [EPA], the Administrator shall respond to such recommendation . . . not later than 180 days after receipt," indicating whether EPA will "initiate a rulemaking or issue such orders as are necessary to implement the recommendation in full or in part, pursuant to any timetable contained in the recommendation." *Id.* § 7412(r)(6)(I). If the Administrator decides not to implement the CSB's recommendation in whole or part, "including any variation from the schedule contained in the recommendation," the Administrator must provide a statement "setting forth the reasons for such determination." *Id.*

Section 7412(r)(7) authorizes EPA to "promulgate release prevention, detection, and correction requirements which may include monitoring, record-keeping, reporting, training, vapor recovery, secondary containment, and other design, equipment, work practice, and operational requirements." *Id.* § 7412(r)(7)(A). "Regulations promulgated pursuant to this subparagraph shall have an effective date, as determined by the Administrator, assuring compliance as expeditiously as practicable." *Id.* That section also requires EPA to "promulgate reasonable regulations and appropriate guidance to provide, to the greatest extent practicable, for the prevention and detection of accidental releases of regulated substances and for response to such releases by the owners or operators of the sources of such releases," and requires that such regulations "be applicable to a stationary source 3 years after the date of promulgation." *Id.* § 7412(r)(7)(B)(i). These regulations must direct stationary sources to implement a Risk Management Plan ("RMP") to "detect and prevent or minimize accidental releases . . . and to provide a prompt emergency response to

any such releases in order to protect human health and the environment." *Id.* § 7412(r)(7)(B)(ii). The RMPs must be registered with the EPA and available to the public. *Id.* § 7412(r)(7)(B)(iii).

Under Section 307(d)(7)(B) of the CAA, 42 U.S.C. § 7607(d)(7)(B), EPA must convene a proceeding to reconsider a rule if a person "raising an objection can demonstrate to the Administrator that [1] it was impracticable to raise such objection within [the notice and comment period] . . . and [2] if such objection is of central relevance to the outcome of the rule." *Clean Air Council v. Pruitt*, 862 F.3d 1, 4–5 (D.C. Cir. 2017) (alterations in original). "Such reconsideration shall not postpone the effectiveness of the rule." 42 U.S.C. § 7607(d)(7)(B). "The statute also provides that the 'effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.'" *Clean Air Council*, 862 F.3d at 5 (quoting § 7607(d)(7)(B)).

**B.**

EPA first promulgated accidental release prevention regulations in 1996. Accidental Release Prevention Requirements: Risk Management Programs Under Clean Air Act Section [7412(r)(7)], 61 Fed. Reg. 31,668 (June 20, 1996). In July 2012, a coalition of environmental groups, community organizations, unions, and health workers petitioned EPA for a rulemaking under Section 7412(r)(7) to "require the use of inherently safer technologies, where feasible, by facilities that use or store hazardous chemicals." Greenpeace, United Steelworkers, Sierra Club *et al.*, Petition to Prevent Chemical Disasters to EPA Administrator Lisa Jackson (July 25, 2012). The petition cited dangers from releases caused both by accidents and by terrorist attacks on U.S. chemical facilities.

Soon after, several chemical accidents occurred that received significant public attention and became subjects of CSB investigations. These accidents included the April 2013 explosion of a fertilizer plant in West, Texas and the June 2013 explosion of a chemical plant in Geismar, Louisiana. *See Oversight of Federal Risk Management and Emergency Planning Programs to Prevent and Address Chemical Threats, Including the Events Leading Up to the Explosions in West, TX and Geismar, LA, Hearing Before the S. Comm. on Envt. & Pub. Works*, 113th Cong. (2013) (statement of Rafael Moure-Eraso, Chairperson of the U.S. Chemical Safety Board). The West, Texas disaster involved a fire and explosion that crushed buildings and sent projectiles into neighboring communities, killing twelve first responders and two members of the public and causing $230 million in damage. The Geismar, Louisiana disaster also involved a fire and explosion, which killed two workers and injured many more.

On August 1, 2013, President Obama issued an executive order establishing a Chemical Facility Safety and Security Working Group co-chaired by the EPA Administrator and the Secretaries of Labor and Homeland Security. Exec. Order No. 13,650 § 2, *Improving Chemical Facility Safety and Security*, 78 Fed. Reg. 48,029 (Aug. 1, 2013). The Executive Order directed that within 90 days,

> [T]he Administrator of EPA and the Secretary of Labor shall review the chemical hazards covered by the Risk Management Program (RMP) . . . and determine if [it] can and should be expanded to address additional regulated substances and types of hazards. In addition, the EPA . . . shall develop a plan, including a timeline and resource requirements, to expand, implement, and enforce [the RMP] in a manner that

addresses the additional regulated substances and types of hazards.

*Id.* § 6(c).

One year later, EPA published a request for information in the Federal Register seeking comment on "potential revisions to its [accidental release] regulations and related programs." Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act, Section [7412(r)(7)], 79 Fed. Reg. 44,604, 44,604 (July 31, 2014). The request solicited comments on dozens of potential regulatory actions under Section 7412(r), citing several chemical accidents that had occurred since the most recent promulgation of accidental release prevention requirements under that section. EPA received over 100,000 responses, including a 50-page letter from the CSB recommending dozens of regulatory regulations based on research and recent accident investigations.

In March 2016, EPA issued a Notice of Proposed Rulemaking proposing amendments to the accidental release prevention regulations. Accidental Release Prevention Requirements: Risk Management Programs under the Clean Air Act ("Disaster Rule NPRM"), 81 Fed. Reg. 13,638 (Mar. 14, 2016). The Disaster Rule NPRM explained that although EPA "believe[d] the [existing regulations] ha[ve] been effective in preventing and mitigating chemical accidents . . . [,] major incidents, such as the West, Texas explosion, highlight the importance of reviewing and evaluating current practices and regulatory requirements, and applying lessons learned . . . to advance process safety where needed." *Id.* at 13,646. EPA also explained that "[i]n addition to the tragedy at the West Fertilizer facility, *a number of other incidents* have demonstrated a significant risk to the safety of

American workers and communities," and proceeded to discuss several recent explosions and fires that resulted in death, injury, and property damage to workers, first responders, and local communities. *Id.* at 13,644 (emphasis added). EPA estimated the annualized cost of on-site damages from chemical releases was $274.7 million, and estimated the cost of carrying out the proposed rule would be $131.2 million annually for the 12,500 facilities potentially subject to its requirements. Although EPA was "unable to quantify what specific reductions [in damages] may occur as a result of these proposed revisions [to the accidental release regulations]," it "anticipate[d] that promulgation and implementation of this rule would result in a reduction of the frequency and magnitude of damages from releases," and "expect[ed] that some portion of future damages would be prevented through implementation of a final rule." *Id.* at 13,642. Further, EPA found, "the monetized impacts omit many important categories of accident impacts including lost productivity, the costs of emergency response, transaction costs, property value impacts in the surrounding community . . . , and environmental impacts." *Id.* at 13,643. The Disaster Rule NPRM specifically solicited comments on proposed compliance and effective dates for the various requirements.

EPA promulgated a final rule on January 13, 2017. Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act ("Chemical Disaster Rule"), 82 Fed. Reg. 4594 (Jan. 13, 2017). The final rule revised dozens of Section 7412(r)(7) requirements in three major areas: (1) accident prevention, including expanded post-accident investigations, more rigorous safety audits, safety training, and safer technology requirements; (2) emergency response, including more frequent coordination with local first responders and emergency response committees, and more intensive incident-response exercises; and (3) public

information disclosure, including public disclosure of safety information and public-meeting requirements. EPA responded to comments it received regarding the appropriate effective and compliance dates for various provisions of the rule and explained in detail why it chose to adopt or reject these recommendations. The final rule set an overall effective date of March 14, 2017, sixty days after promulgation. *Id.* at 4594. Some provisions related to clarifying regulatory definitions went into effect on that date. Others, including most local emergency-response coordination requirements, became effective in one year, on March 14, 2018. *Id.* at 4678. The requirements for emergency response exercises, public information-sharing and post-accident public meetings, third-party audits, more rigorous post-incident analyses, and safer technology requirements became effective three years later, on March 15, 2021. *Id.* The compliance deadline for covered facilities to submit an updated RMP was March 14, 2022. *Id.*

## C.

Following a change in presidential administration, EPA delayed the effective date of the final Chemical Disaster Rule three times. On January 26, 2017, less than two weeks after promulgation of the rule, EPA published a final rule delaying its effective date by one week, to March 21, 2017, along with the effective dates of twenty-nine other final EPA rules. Delay of Effective Date for 30 Final Regulations Published by the Environmental Protection Agency Between October 28, 2016 and January 17, 2017, 82 Fed. Reg. 8499-02 (Jan. 26, 2017). This initial delay implemented a January 20, 2017 memorandum from then-White House Chief of Staff Reince Priebus directing agency heads to "temporarily postpone [the] effective dates for 60 days" of regulations that had been promulgated but not yet taken effect. Memorandum from Reince Priebus to Heads of Executive Departments and

Agencies: Regulatory Freeze Pending Review (Jan. 20, 2017) ("Priebus Memorandum"). The Priebus Memorandum also directed agency heads to "consider proposing for notice and comment a rule to delay the effective date for regulations beyond that 60-day period." *Id.*

On February 28, 2017, a coalition of industry groups submitted a petition for reconsideration of the Chemical Disaster Rule. A group of states also petitioned for reconsideration. About two weeks later, the EPA Administrator announced his determination that the criteria for reconsideration under Section 7607(d)(7)(B) had been met and, pursuant to that section, administratively stayed the Chemical Disaster Rule's effective dates for ninety days, until June 19, 2017. *See* Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act; Further Delay of Effective Date ("90-Day Stay"), 82 Fed. Reg. 13,968-02 (Mar. 16, 2017). During that stay, on April 3, 2017, EPA issued a notice of proposed rulemaking proposing to delay the effective date of the Chemical Disaster Rule by an additional 20 months, until February 19, 2019. Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act; Further Delay of Effective Date ("Delay Rule NPRM"), 82 Fed. Reg. 16,146-01, 16,148 (Apr. 3, 2017).

EPA promulgated the final rule on June 14, 2017, delaying the effective date of the Chemical Disaster Rule until February 19, 2019. Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act; Further Delay of Effective Date ("Delay Rule"), 82 Fed. Reg. 27,133-01 (June 14, 2017). The Delay Rule recounted that EPA has received three petitions for reconsideration of the Chemical Disaster Rule "as provided for in [Section 7607(d)(7)(B)]," and that EPA issued a three-month stay under that section because "the criteria for reconsideration ha[d] been met for at least one

of the three objections." *Id.* at 27,134–35. However, EPA explained, Section 7607(d)(7)(B) limits a stay "to three months," and "EPA believed that three months was insufficient to complete the necessary steps in the reconsideration process for the [Chemical Disaster Rule]." *Id.* at 27,135.

Thus, according to EPA, the Delay Rule has the purpose of "allow[ing] EPA to conduct a reconsideration proceeding and to consider other issues that may benefit from additional comment." *Id.* at 27,133. The Delay Rule further explained that EPA might take additional action during the 20-month delay period, "which could include proposing and finalizing a rule to revise or rescind [the Chemical Disaster Rule]." *Id.* EPA justified its choice of a 20-month delay because of the complex issues involved and "[b]ased on EPA rulemaking experience," without further elaboration. *Id.* at 27,140. It justified its delay of the first-responder coordination provisions — which otherwise would have been effective on March 14, 2018 — because "[i]n agreeing to convene a proceeding for reconsideration of the final rule, EPA agreed to provide the public with an opportunity to comment on other issues . . . . By finalizing these provisions immediately, EPA would not be allowing the public an additional opportunity to comment on them." *Id.* at 27,142. The Delay Rule also explained that "[a] delay of effectiveness will allow EPA time for a comprehensive review of objections to the [Chemical Disaster Rule] without imposing the rule's substantial compliance and implementation resource burden when the outcome of the review is pending." *Id.* at 27,136. EPA stated that "[c]ompliance with all of the rule provisions is not required as long as the rule does not become effective. The EPA did not propose and is not taking any action on any compliance dates at this time." *Id.* As authority for promulgating the Delay Rule, EPA cited Sections 7607(d) and 7412(r)(7). *Id.* at 27,135.

Two groups petitioned for review of the Delay Rule: over a dozen community and environmental groups, including Air Alliance Houston ("Community Petitioners"), and a number of states ("State Petitioners"). The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("United Steelworkers"), intervened on behalf of Community Petitioners. A group of industry interests ("Industry Intervenors"), many of whom had petitioned EPA for reconsideration of the Chemical Disaster Rule, intervened on EPA's behalf.

## II.

As a threshold matter, EPA and Industry Intervenors challenge the Article III standing of Community Petitioners and State Petitioners to bring these petitions. Standing is a structural, constitutional restraint on the subject matter jurisdiction of the federal judiciary. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013). Petitioners in an agency appeal must, in their opening brief, either identify "record evidence" or "submit additional evidence to the court of appeals" to support their standing. *Pub. Citizen, Inc. v. NHTSA* ("*Public Citizen I*"), 489 F.3d 1279, 1289 (D.C. Cir. 2007). "When evaluating such evidence concerning standing, we 'assume that on the merits the plaintiffs would be successful in their claims.'" *Id.* (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)).

To establish standing, a petitioner must show (i) it has "suffered a concrete and particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of the defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision." *Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014) (citing *Lujan v. Defs. of Wildlife*, 504

U.S. 555, 560–61 (1992)). "An allegation of future injury may suffice" to show injury in fact "if the threatened injury is 'certainly impending' or there is a 'substantial risk that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper*, 568 U.S. at 414 n.5). The party asserting standing must also demonstrate "a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. When challenging failure to regulate, a petitioner need demonstrate only a "substantial probability that local conditions will be adversely affected, and thus will harm members of the petitioner organization." *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 63 (D.C. Cir. 2000) (quotation marks omitted). At the same time, "when the [petitioner] is not himself the object of government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)).

"An organization has standing to sue on behalf of its members when . . . 'its members would otherwise have standing to sue in their own right.'" *Public Citizen I*, 489 F.3d at 1289 (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). When organizations assert such representational standing, "they must demonstrate that at least one of their members would otherwise have standing to sue in his or her own right; that the interests they seek to protect are germane to their organizations' purposes; and that neither the claim asserted nor the relief requested requires the participation of individual members." *Sierra Club*, 755 F.3d at 973. "When more than one association brings suit, 'we need only find one party with standing' to satisfy the [standing] requirement." *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C.

Cir. 2017) (quoting *Ams. for Safe Access v. DEA*, 706 F.3d 438, 443 (D.C. Cir. 2013)).

**A.**

EPA and Industry Intervenors do not contest that a challenge to the Delay Rule is germane to Community Petitioners' organizational purposes. Nor do they argue that the participation of individual members is necessary. The question, then, is whether Community Petitioners have adequately shown that at least one of their members meets the requirements of injury, traceability, and redressability. *See Sierra Club*, 755 F.3d at 973. They have.

Even if the only tangible impact of the Delay Rule were delay of the Chemical Disaster Rule's first-responder provisions, the potential harm to members of United Steelworkers is alone sufficient to provide standing to Community Petitioners. *Ctr. for Biological Diversity*, 861 F.3d at 182 (only one organization need have standing). Approximately 25,000 of United Steelworkers' members work in 350 covered chemical plants in the United States, and United Steelworkers-represented "refineries account for almost two-thirds of United States production. No single company, and no other union, either operates, or represents the workers in more plants that are the subject of the [RMP] regulations than" United Steel. Nibarger Decl. ¶ 2 (DEC. 96). Several declarations from United Steelworkers members describe hazards that they face from accidental releases as plant workers and that their families face as residents of communities close to the covered facilities. *See, e.g.*, Kelley Decl. ¶¶ 3–16 (DEC. 21–24); Lilienfeld Decl. ¶¶ 1–11 (DEC. 56–58); Nibarger

Decl. ¶¶ 1–20 (DEC. 96–99).  For example, Ben Lilienfeld, a United Steelworkers member in Baytown, Texas, avers that:

> [A] butadiene release in 2015 at Shell Deer Park Refinery & Chemical in Deer Park, Texas, put our members at risk . . . .  At the LyondellBasell facility in Houston, Texas, multiple fires have occurred over the last several years causing releases.  The same risks that caused the explosions at the Phillips Pasadena complex in 1989 [— a series of explosions at a Texas chemical plant resulting from the accidental release of flammable process gases that killed 23 employees, injured 100 more, and caused $1.4 billion in damage —] still exist today and our members and communities were, are and will remain on the front line.

Lilienfeld Decl. ¶ 10 (DEC. 58); Comment, Coalition to Prevent Chemical Disasters (Oct. 29, 2014), J.A. 497.  Such risks are particularized to chemical plant workers such as the United Steelworkers' members, and EPA found that the Chemical Disaster Rule would reduce the kinds of accidents that Lilienfeld and the other United Steelworkers declarants face in their workplace and communities, and would mitigate such harms by improving coordination between facilities and local first responders.  *See* Chemical Disaster Rule, 82 Fed. Reg. at 4597; EPA Activities Under EO 13650: Risk Management Program (RMP) Final Rule Questions & Answers (June 2017) ("EPA's changes to the RMP rule will help protect local first responders, community members and employees from death or injury due to chemical facility accidents.").  Living and working with a higher risk of such harms than

would exist if the Chemical Disaster Rule became effective on time is therefore directly traceable to the Delay Rule.

**B.**

State Petitioners also have Article III standing. "[T]here is no difficulty in recognizing [a state's] standing to protect proprietary interests or sovereign interests." 13B WRIGHT & MILLER, FED. PRAC. & PROC. § 3531.11.1, *Government Standing – States* (3d ed.). The Supreme Court has recognized "[t]wo kinds of nonsovereign interests" for state standing purposes: proprietary interests such as "own[ing] land or participat[ing] in a business venture," and private interests of another when the state is the "real party in interest." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601–02 (1982).

The Delay Rule affects State Petitioners' proprietary interests due to the expenditures states have previously made and may incur again when responding to accidental releases during the delay period. State Pet. Br. 22–26. Hundreds of covered industrial facilities are located in State Petitioners' territory. Petitioner Washington State spent $370,000 responding to and investigating a refinery explosion that EPA specifically cited as an example of why the existing regulations needed to be strengthened. State Pet. Br. 26; Chemical Disaster Rule, 82 Fed. Reg. at 4599; *see also* Disaster Rule NPRM, 79 Fed. Reg. at 44,621 (explaining that the CSB found that this explosion in Washington State "could have been avoided if safer technologies had been employed"). Monetary expenditures to mitigate and recover from harms that could have been prevented absent the Delay Rule are precisely the kind of "pocketbook" injury that is incurred by the state itself. *See Snapp*, 458 U.S. at 602. Because State Petitioners have demonstrated their independent proprietary interests in

avoiding chemical releases in their territory sufficient to support standing, the court need not reach the alternative argument that Congress has abrogated the prudential bar on state *parens patriae* standing under the CAA. *See Md. People's Counsel v. FERC*, 760 F.2d 318, 320 (D.C. Cir. 1985).

**III.**

EPA has thrice delayed the effective date of the Chemical Disaster Rule, 82 Fed. Reg. 4594 (Jan. 13, 2017) (eff. Mar. 14, 2017). *First*, in response to a White House memorandum of January 20, 2017, EPA delayed the effective date by one week. Priebus Memorandum, 82 Fed. Reg. 8499-02 (Jan. 26, 2017). *Second*, on March 16, 2017, EPA granted industry petitions for reconsideration and stayed the effective date and compliance dates of the Chemical Disaster Rule for three months pursuant to Section 7607(d)(7)(B). 90-Day Stay, 82 Fed. Reg. 13,968-02 (Mar. 16, 2017). *Third*, during this stay, EPA promulgated the Delay Rule, 82 Fed. Reg. 27,133 (June 14, 2017). The preamble to the Delay Rule states that it allows EPA, beyond the three-month period authorized in Section 7607(d)(7)(B), "an additional 20 months . . . to conduct reconsideration proceedings and to consider *other issues that may benefit* from additional comment." *Id.* (emphasis added).

"[I]t is 'axiomatic' that 'administrative agencies may act only pursuant to authority delegated to them by Congress.'" *Clean Air Council*, 862 F.3d at 9 (quoting *Verizon v. FCC*, 740 F.3d 623, 632 (D.C. Cir. 2014)). This court reviews "an agency's construction of the statute which it administers" under the framework of *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842 (1984). If "Congress has spoken directly to the precise question at issue" and "the intent of Congress is clear,

that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. But "if the statute is silent or ambiguous with respect to the specific issue," the court will uphold the agency's interpretation if it is reasonable. *Id.* at 843.

Section 7607(d)(7)(B) provides that reconsideration of a final rule pursuant to that section "shall not postpone the effectiveness of the rule" and that the "effectiveness of the rule may be stayed during such reconsideration . . . for a period not to exceed three months." It is beyond dispute that EPA relied upon Section 7607(d)(7)(B) when delaying the Chemical Disaster Rule in response to reconsideration petitions. Delay Rule, 82 Fed. Reg. at 27,134. Throughout the Delay Rule, EPA repeatedly justified delay of effective dates on the basis that it needs more time to reconsider the Chemical Disaster Rule than was provided under Section 7607(d)(7)(B). *See id.* at 27,136 ("A delay of effectiveness will allow EPA time for a comprehensive review of objections to the [Chemical Disaster Rule] without imposing the rule's substantial compliance and implementation resource burden when the outcome of the review is pending."); *id.* at 27,138 ("EPA concurs with commenters to the extent that they argue for finalizing the proposed delay in effective date . . . *in order to conduct a reconsideration proceeding*." (emphasis added)); *id.* at 27,140 ("[T]hese issues may be difficult and time consuming to evaluate."). The only justification offered in EPA's short summary of the Delay Rule is that it "allows the Agency time to consider petitions for reconsideration of the [Chemical Disaster Rule] and take further regulatory action, as appropriate." *Id.* at 27,133. But regardless whether EPA "believe[s] that three months [is] insufficient to complete the necessary steps in the reconsideration process," *id.* at 27,135, that is not EPA's call. Congress saw fit to place a three-month statutory limit on "such reconsideration," 42 U.S.C.

§ 7607(d)(7)(B), and this court "must give effect to the unambiguously expressed intent of Congress," *Chevron*, 467 U.S. at 843. Because the Delay Rule arose from reconsideration petitions under Section 7607(d)(7)(B) and EPA's reliance on its authority to delay a rule for reconsideration under that provision, that statute's limitations apply.

Tellingly, EPA's briefing makes no mention of its reliance on Section 7607(d)(7)(B) in promulgating and justifying the Delay Rule. Rather, EPA argues that the Delay Rule is permissible under 42 U.S.C. § 7412(r)(7), which provides that a rule's effective date "as determined by the Administrator" must "assure[] compliance as expeditiously as practicable." *See* Respondent Br. 27–35. Even if Section 7412(r)(7) grants EPA authority to delay the effectiveness of a final rule in the absence of reconsideration under Section 7607(d)(7)(B), it is well established that an agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority. As we explained in *NRDC v. Reilly*, a "general grant of rulemaking power . . . [cannot] trump the specific provisions of the act." 976 F.2d 36, 40 (D.C. Cir. 1992); *see also Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 169–70 (2007) (explaining that when two regulations conflict on the same subject matter, "the specific governs the general," and the more specific regulation applies). Similarly, in *Halverson v. Slater*, this court held that the Secretary of Transportation's general statutory authority to delegate "duties and powers of the Secretary to an officer or an employee of the Department" was trumped by a more specific provision that the "Secretary may delegate the duties and powers conferred by this subtitle . . . to any officer, employee, or member of the Coast Guard." 129 F.3d 180, 183–84 (D.C. Cir. 1997). This court rejected the Secretary's argument that he could use his general delegation authority absent an express restriction on

that authority, concluding that under *Chevron* step one, "the language of [the more specific provision] compels the conclusion that the Congress did not intend to authorize delegation of [these] functions to a non-Coast Guard official." *Id.* at 185; *see also Chemical Waste Mgmt., Inc. v. EPA*, 976 F.3d 2, 22 (D.C. Cir. 1992) (EPA may not "accommodate" two statutes by allowing one to "override" the more specific requirements of the other).

So too here.  EPA cannot escape Congress's clear intent to specifically limit the agency's authority under Section 7607(d)(7)(B) by grasping at its separate, more general authority under Section 7412(r)(7).  That would almost always allow EPA to avoid the restrictions of Section 7607(d)(7)(B) by simply insisting it was invoking Section 7412(r)(7), even when it is indisputably responding to a Section 7607(d)(7)(B) petition and reconsidering a rule under that specific provision. Such an unreasonable interpretation "would deprive [the more specific authority] of virtually all effect." *Halverson*, 129 F.3d at 189 (quoting *Am. Fed'n of Gov't Emps. v. FLRA*, 798 F.2d 1525, 1528 (D.C. Cir. 1986)).

The court's conclusion that the plain text of Section 7607(d)(7)(B) limits EPA's authority to delay final rules for the purposes of reconsideration under that provision is bolstered by the statute's history.  Congress enacted the CAA in 1970 to encourage and promote "pollution prevention."  42 U.S.C. § 7401(c).  It found that that air pollution posed "mounting dangers to the public health and welfare, including injury to agricultural crops and livestock, damage to and the deterioration of property, and hazards to air and ground transportation."  *Id.* § 7401(a)(2).  It envisioned a cooperative effort by federal, state, and local governments to, among other things, "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare."  *Id.*

§ 7401(b), (c).  EPA was directed to carry out these purposes by, for instance, identifying and listing hazardous air pollutants ("HAPs"), setting standards for mobile sources, and issuing rules for new stationary sources.  In fact, statutory deadlines were not met for meeting the National Ambient Air Quality Standards ("NAAQS"), and Congress found that "many of the Nation's most important air pollution problems have failed to improve or have grown more serious."  H.R. REP. No. 101-490, at 144 (May 17, 1990).  Also, "a number of serious new air pollution problems have emerged."  *Id.*  In 20 years, EPA had established standards for only seven HAPs, "a small fraction of the many substances associated . . . with cancer, birth defects, neurological damage, or other serious health impacts."  *Id.* at 151.

In 1990, Congress — no longer willing to wait for EPA to act — amended the CAA.  Section 7412 of Title III, the HAPs provision, was amended to establish "a new program for the control of [HAPs]."  *Id.* at 315.  Congress identified and listed 189 HAPs and assigned specific timetables for the promulgation of regulations and the attainment of NAAQS. Significantly for present purposes, Congress was aware that "[a]ccidental releases of air toxics occur with surprising frequency."  *Id.* at 154.  The 1990 Amendments created "a new program under which EPA is to establish reasonable and appropriate regulations to prevent and detect accidental releases to the maximum extent practicable."  *Id.* at 157; *see* S. REP. No. 101-228, at 237 (Dec. 20, 1989).  The section-by-section analysis stated:

> *Accident prevention, detection, and response.*— [Section 7412(r)(7)] directs the Administrator within three years of enactment to promulgate, in consultation with the Secretaries of Transportation and Labor . . . regulations to provide, to the greatest

extent practicable, for the prevention and detection of accidental releases into the ambient air. The regulations must also provide for effective responses to such accidental releases by regulated sources. The regulations are to take effect three years after promulgation.

H.R. REP. No. 101-490, at 334.

The Chemical Disaster Rule is the most recent outgrowth of Congress's effort in the 1990 Amendments to ensure adequate protections against highly dangerous accidental releases of chemicals. By Executive Order No. 13,650, *Improving Chemical Facility Safety and Security*, 78 Fed. Reg. 48,029 (Aug. 1, 2013), issued in the wake of serious disasters at chemical plants, EPA and several other agencies were directed to "improve chemical facility safety and security in coordination with owners and operators," *id.* § 1, and EPA was instructed to strengthen its accident prevention regulations, *id.* §§ 2–7. EPA issued a notice of proposed rulemaking in March 2016, held public hearings, and received written comments. The final rule revised and strengthened accident prevention, emergency response, and public information disclosure requirements. Chemical Disaster Rule, 82 Fed. Reg. at 4595; *see supra* Part [I.B]. It was to take effect in 30 days, on March 14, 2017, with different compliance dates for some provisions in order to accommodate industry needs. Chemical Disaster Rule, 82 Fed. Reg. at 4594, 4678.

EPA brought this regulatory action to a halt. Section 7607(d)(7)(B) provides:

If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for

> such objection arose after the period for public comment . . . and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule . . . . *Such* reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for *a period not to exceed three months*.

42 U.S.C. § 7607(d)(7)(B) (emphasis added). In the Delay Rule, EPA interpreted that provision as "generally allow[ing] the EPA to set effective dates as appropriate unless other provisions of the CAA control." Delay Rule, 82 Fed. Reg. at 27,135. As an initial matter, EPA previously interpreted that provision as establishing the CAA's exclusive mechanism for staying the effectiveness of a final rule pending reconsideration. *See* EPA Mem. in Opp. to Sierra Club's Mot. for Summ. J. at 11, *Sierra Club v. Jackson*, No. 1:11-cv-01278 (D.D.C. Aug. 25, 2011). In any event, there is no textual basis for EPA's current interpretation.

The court has explained that Section 7607(d)(7)(B) "authorizes the agency to grant a stay during '*such* reconsideration,' a term that quite obviously refers back to the reconsideration EPA 'shall' undertake when someone presents an objection of 'central relevance' that was 'impracticable' to raise during the period for public comment." *Clean Air Council*, 862 F.3d at 9 (emphasis added) (quoting 42 U.S.C. § 7607(d)(7)(B)). Regardless whether the three-month stay authorized by Section 7607(d)(7)(B) is cabined by the word "such," the Delay Rule is the functional equivalent of a stay under that section. It is based on industry petitions for reconsideration and is the direct outgrowth of the three-month stay EPA issued under Section 7607(d)(7)(B). In the Delay

Rule, EPA makes no finding that a 20-month delay is required for regulated parties over and above the delayed compliance dates in the Chemical Disaster Rule. Instead, EPA repeatedly states that it was using the 20 months merely to reconsider concerns expressed by industry and unidentified "other issues that may benefit from additional comment." Delay Rule, 82 Fed. Reg. at 27,133, 27,135, 27,140. It has neither adopted industry concerns as its own nor proposed substantive changes to the programmatic requirements of the Chemical Disaster Rule. Because the Delay Rule is for all intents and purposes a Section 7607(d)(7)(B) stay pending reconsideration for EPA to decide what it wants to do, rather than a substantive amendment to tools and programs in the Chemical Disaster Rule, it cannot delay the effective date beyond three months.

Nor is the Delay Rule authorized by Section 7412(r)(7). Section 7412(r)(7) is a comprehensive accident prevention regime affording EPA broad discretion as to regulatory tools, albeit with multiple requirements. Subparagraph (A) references types of *substantive* actions that EPA may require by regulation: "release prevention, detection, and correction requirements which may include monitoring, record-keeping, reporting, training, vapor recovery, secondary containment, and other design, equipment, work practice, and operational requirements." Once EPA makes a substantive regulatory choice — to add, modify, or subtract requirements — EPA must set an effective date for that choice that will "assur[e] compliance as expeditiously as practicable." Subparagraph (B) requires EPA to determine that such regulations "provide, to the greatest extent practicable, for the prevention and detection of accidental releases of regulated substances." And subparagraph (E) provides that the three-month time limit of Section 7607(d)(7)(B) applies to regulations promulgated pursuant to Section 7412(r)(7). Reading the plain text makes clear that Congress is seeking meaningful, prompt *action* by

EPA to promote accident prevention. In this way, the framework of Section 7412(r)(7) does not differ significantly from the "highly circumscribed schedule" analyzed in *Reilly*, 976 F.2d at 41, where the court held that EPA's general rulemaking authority under the CAA could not "trump the specific provisions of the Act," *id.* Section 7412(r)(7) contains several "highly circumscribed" timing components. *See* S. REP. No. 101-228, at 237–39.

The Delay Rule is not the type of substantive amendment authorized by Section 7412(r)(7). EPA has interpreted that section as according it "flexibility to make a rule effective with no specific outside date beyond that which 'assur[es] compliance as expeditiously as practicable.'" Delay Rule, 82 Fed. Reg. at 27,135. The Delay Rule states that "[i]n light of EPA's commitment to take further regulatory action *in the near future*, with the potential for a broad range of rule revisions . . . and the substantial resources required," "several industry trade associations" that had submitted "comment agreed that the 20-month delay in the effective date would be as expeditious[] as practicable." *Id.* (emphasis added). But EPA merely references arguments without standing behind any of them. By its own repeated admissions in the preamble to the Delay Rule, EPA has made no substantive decisions demanded by Section 7412(r)(7). The preamble reveals no attempt by EPA to consider how much time industry needs to comply, or why 20 months, as opposed to some other period of delay, are necessary. Nor does it engage with EPA's determinations and findings in the Chemical Disaster Rule with respect to compliance dates. *See* 82 Fed. Reg. at 4675–80 (Part VIII). Nor does EPA claim to have changed those findings or taken any action with respect to them. Instead, EPA posits instead that the Delay Rule is designed to allow *it* time to rethink "the difficulties of compliance planning" while also claiming it is not revisiting the compliance dates or the rationale underlying

them. Delay Rule, 82 Fed. Reg. at 27,137. *But see id.* at 27,144 n.23. To the extent EPA offers any reasoning — namely, that "[a] delay of 20 months is a reasonable length of time" for *it* "to engage in the process of revisiting issues in the underlying [Chemical Disaster Rule]," *id.* at 27,136 — that reasoning does not relate to what is "practicable" for compliance by regulated sources; its explanation relates to its own "unidentified, new 'policy preferences' and the mere fact of reconsideration." Cmty. Pet. Br. 42 (quoting Delay Rule, 82 Fed. Reg. at 27,136).

This makes a mockery of the statute. The Delay Rule does not have the purpose or effect of "assur[ing] compliance" with Section 7412(r)(7); it is calculated to enable non-compliance. The Delay Rule removes both immediate and future obligations under the Chemical Disaster Rule, authorizing regulated facilities to ignore all pre-2019 deadlines. Delay Rule, 82 Fed. Reg. at 27,142, 27,144 n.23. Read as a whole, Section 7412(r)(7)'s effective date provision is intended to provide a short window of notice before facilities are required to comply or prepare to comply with agency regulations. *See* 42 U.S.C. § 7412(r)(7)(E). In addition, the Delay Rule does not demonstrate, or even acknowledge, that EPA considered Section 7412(r)(7)'s statutory objectives, namely, to "prevent accidental releases," to "minimize . . . consequences of any such release," to "protect human health and the environment," and "to include procedures and measures for emergency response after an accidental release." *Id.* § 7412(r)(1), (r)(7)(A), (r)(7)(B). The Delay Rule undermines these objectives without explaining why implementation delay was necessary; it refers only to the fact of EPA's own reconsideration. By contrast with EPA's final, record-based determinations in setting the Chemical Disaster Rule's effective and compliance dates, EPA makes no findings of its own in the Delay Rule. It refers merely to alleged "security risks" and other hypotheticals raised by industry without

endorsing those findings or concerns. *See, e.g.*, Delay Rule, 82 Fed. Reg. at 27,136, 27,138, 27,140–41. Indeed, EPA *explicitly* conceded that it "has not concluded [the Chemical Disaster Rule] would increase such risks." *Id.* at 27,141. The Delay Rule thus contains no provisions that advance or accomplish these goals, but instead delays these objectives contrary to EPA's prior determinations in a rulemaking.

By delaying the effective date, EPA has delayed compliance, reduced or eliminated the lead-up time to achieve the compliance that EPA had earlier found necessary, and thus has delayed life-saving protections. EPA may not employ delay tactics to effectively repeal a final rule while sidestepping the statutorily mandated process for revising or repealing that rule on the merits. EPA states that it "does not wish to cause confusion among the regulated community and local responders by requiring these parties to prepare to comply with, or in some cases, immediately comply with, rule provisions that might be changed during the subsequent reconsideration." *Id.* at 27,139. But this "confusion" stems solely from the confusion EPA has caused by the almost two-years' reconsideration it desires in order to decide what it wants to do, not compliance concerns relevant to regulated facilities' implementation of the Chemical Disaster Rule. That is not a basis for delaying protections. That the pre-existing rule remains in effect during the delay period does not show the Delay Rule satisfies Section 7412(r)(7). In promulgating the Chemical Disaster Rule, EPA had found, and the record shows, that there was a need for improvements to protect worker and community safety, and to reduce facilities, injuries, life disruption, and other harm. Chemical Disaster Rule, 82 Fed. Reg. at 4599–600.

Without regard to context, purpose, or history, EPA has equated its authority to amend a final rule pursuant to

applicable statutory requirements with authority to delay a final rule merely because EPA is *considering* revising it. Delay Rule, 82 Fed. Reg. at 27,133, 27,136, 27,138. The overarching statutory purpose and design of the CAA, as well as the statutory context of Section 7412(r)(7) and Section 7607(d)(7)(B), reject an interpretation that EPA can further delay a final rule for reconsideration when it has neither explained it has reached a different conclusion about preventing accidental releases nor offered new evidence to support a different conclusion, but has delayed a final rule based on speculation about future amendments. That does not conform to the carefully designed regime Congress envisioned in the 1990 Amendments. Congress has twice emphasized the finality of CAA rules by prohibiting reconsideration from delaying a final rule. Section 7607(d)(7)(B) provides a strict limit of three months on stays of effective dates pending reconsideration, and Section 7607(b)(1) provides that a petition for judicial review "shall not affect the finality of such rule . . . and shall not postpone the effectiveness of such rule." These provisions (read in light of the history of the 1990 Amendments) show Congress intended EPA to act with appropriate dispatch, not to delay protections. EPA points to nothing that would allow a misuse of its substantive rulemaking authority to evade these limits.

EPA's interpretation of its delay authority is not reasonable because it has no stopping point. Nothing in the text, context, structure, or history of the CAA supports interpreting Section 7412(r)(7) as allowing delays akin to those that prompted Congress to adopt the 1990 Amendments in order to spur EPA action. As Community Petitioners note, the absence of a date from the "practicable" clause in Section 7412(r)(7)(B) does not reveal a lack of legislative urgency for effectiveness and compliance, but rather reflects Congress's acknowledgement that, depending on EPA's regulatory

choices, some flexibility in timing might be required. *See* Cmty. Pet. Br. 44 (citing S. REP. No. 101-228, at 234–35, 245). EPA may not "substitut[e] [its] desires for the plain text" of the Act. *New Jersey v. EPA*, 517 F.3d 574, 582–83 (D.C. Cir. 2008). Nor may it render illusory a limitation like Section 7607(d)(7)(B), which is designed to limit EPA's authority and facilitate judicial review by assuring finality and creating an agency record. *See* S. REP. No. 101-228, at 372.

For these reasons, the Delay Rule must be vacated. Our holding is narrow, as our analysis makes clear. In the Delay Rule, EPA has neither substantively amended — nor proposed any substantive amendments to — the Chemical Disaster Rule, but instead seeks to delay that rule pending reconsideration during which it decides what it wants to do. EPA retains authority under Section 7412(r)(7) to substantively amend the programmatic requirements of the Chemical Disaster Rule, and pursuant to that authority, revise its effective and compliance dates, subject to arbitrary and capricious review.

## IV.

Moreover, EPA's promulgation of the Delay Rule was arbitrary and capricious. Although "[t]he scope of review under the 'arbitrary and capricious' standard is narrow . . . the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational explanation of the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted). When an agency reverses itself, it "must show that there are good reasons for the new policy," but it need not show that "the reasons for the new policy are *better* than the reasons for the old one." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). However, if the "new policy

rests upon factual findings that contradict those which underlay its prior policy," it must provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–16; *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) ("[A]n 'unexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" (quoting *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005))).

EPA's explanations for its changed position on the appropriate effective and compliance dates are inadequate under *Fox* and *State Farm*, and therefore arbitrary and capricious, for several reasons. *See* 42 U.S.C. § 7607(d)(9).

*First*, EPA repeatedly justifies the 20-month delay as providing time for taking and considering public comment on the Chemical Disaster Rule and any potential revisions or rescission thereof. But EPA nowhere explains how the effectiveness of the rule would prevent EPA from undertaking notice and comment or other tasks for reconsideration, why a delay is necessary to EPA's process, or how the Chemical Disaster Rule becoming effective on schedule would otherwise impede its ability to reconsider that rule. *See Public Citizen v. Steed*, 733 F.2d 93, 102 (D.C. Cir. 1984) ("Without showing that the old policy is unreasonable, for [the agency] to say that no policy is better than the old policy solely because a new policy *might* be put into place in the indefinite future is as silly as it sounds." (emphasis in original)). Agencies regularly reconsider rules that are already in effect. But as the Second Circuit has pointed out, "a decision to reconsider a rule does not simultaneously convey authority to indefinitely delay the existing rule pending that reconsideration." *NRDC v. NHTSA*, 894 F.3d 92, 111–12 (2d Cir. 2018) (citing *Clean Air Council*,

862 F.3d at 9). Thus, the mere fact of reconsideration, alone, is not a sufficient basis to delay promulgated effective dates specifically chosen by EPA on the basis of public input and reasoned explanation, particularly where the statute requires the agency to "assur[e] compliance as expeditiously as practicable." 42 U.S.C. § 7412(r)(7)(A). Further, under the plain text of Section 7412(r)(7), the timeframe for effective or compliance dates must be justified in terms of "*assuring compliance* as expeditiously as practicable," meaning that EPA must explain why its proposed timeline is practicable for regulated parties *to comply with the rule expeditiously* — not for the agency to engage in the regulatory process. *Id.* (emphasis added).

*Second*, nothing in the Delay Rule explains EPA's departure from its stated reasoning in setting the original effective date and compliance dates. In promulgating the Chemical Disaster Rule, EPA considered comments specifically about the rule's proposed effective date and the compliance timeline for various requirements, and explained why it adopted or rejected the comments. *See* Chemical Disaster Rule, 82 Fed. Reg. at 4675–78. For example, EPA "received comments supporting the proposed one-year compliance date for emergency response coordination activities," and "EPA agree[d] with commenters and [was] finalizing a one-year compliance date for emergency response coordination activities." *Id.* at 4,677. As another example, one commenter objected to a four-year compliance date for emergency-response exercises and argued the deadline should be one year; EPA disagreed because four years would "allow owners and operators to develop an exercise program," train personnel, and familiarize themselves with guidance EPA expected to develop after promulgation of the Chemical Disaster Rule. *Id.*

The Delay Rule does not explain its departure from EPA's previous conclusions regarding the appropriate and practicable timeline for implementing the Chemical Disaster Rule. Nor does it explain why the detailed factual findings regarding the harm that would be prevented upon implementation of the Chemical Disaster Rule are now only "speculative," *id.* at 27,139, or why the entire rule must be delayed wholesale despite its many different provisions with different effective and compliance dates. Although EPA need not show that "the reasons for the new policy are *better* than the reasons for the old one," it must provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox*, 556 U.S. at 515–16. EPA has not done so. Instead, EPA attempts to minimize the impact of the Delay Rule by asserting that by merely delaying the overall effective date until February 2019, it leaves the major compliance dates unaffected. Delay Rule, 82 Fed. Reg. at 27,137 ("This rule does not impact compliance dates except for those dates that would be triggered prior to February 2019."). This assertion is incompatible with the EPA's statement in the Delay Rule — and the common-sense conclusion — that "[a] delay of effectiveness will allow EPA time for a comprehensive review of objections to the [Chemical Disaster Rule] without imposing the rule's substantial compliance and implementation resource burden when the outcome of the review is pending." *Id.* at 27,136. EPA and the Industry Intervenors contend that the Delay Rule has no significant costs because it merely maintains the "status quo," as regulated sources are not required to comply with all but one "major" provision until 2020. Putting aside EPA's concession that the Delay Rule immediately delays multiple "minor" provisions and would delay the "major" first-responder coordination provisions, the baseline for measuring the impact of a change or rescission of a final rule is the requirements of the rule itself, not the world as it would have been had the rule

never been promulgated. *See Consarc Corp. v. OFAC*, 71 F.3d 909, 913 (D.C. Cir. 1995) ("The legal definition of *status quo ante* [is] . . . the last uncontested status which preceded the pending controversy." (quotations marks omitted)). The status quo would be a Chemical Disaster Rule that went into effect on March 14, 2017, with the ongoing compliance efforts by regulated parties to meet the compliance deadlines set in that rule.

EPA cannot have it both ways. Either there would be "substantial compliance and implementation" efforts by regulated parties absent the Delay Rule, or the rule has no effect on compliance requirements and does nothing more than maintain the status quo with "speculative but likely minimal . . . foregone benefits." Delay Rule, 82 Fed. Reg. at 27,139. Therefore, EPA has failed to rationally explain its departure from its previous conclusions about appropriate compliance periods that it reached after specifically soliciting and considering comments on the subject. *See NRDC, Inc. v. EPA*, 683 F.2d 752, 760–61 (3d Cir. 1982) ("By postponing the effective date of the amendments, EPA reversed its course of action up to the postponement. That reversal itself constitutes a danger signal.").

*Third*, contrary to EPA's statement in the Delay Rule that "the timing" of a "finding by the Bureau of Alcohol, Tobacco, and Firearms . . . that the West Fertilizer explosion was caused by arson" rather than an accident supports delay, that is not a reasoned basis for delaying the *entire* Chemical Disaster Rule. *See* 82 Fed. Reg. at 27,137–38. EPA cited many more incidents than just the West, Texas disaster throughout the development and promulgation of the rule. *See, e.g.*, Chemical Disaster Rule NPRM, 79 Fed. Reg. at 44,608 ("An April 8, 2011 explosion at [a plant in] Hawaii killed five workers who were disposing of fireworks."); *id.* at 44,616 ("In October

2007, five contractor workers were killed [at a plant] in Georgetown, Colorado, when a fire occurred inside a tunnel . . . . The CSB found that inadequate contractor safety practices and oversight contributed to the accident."); *id.* at 44,618 (citing the "CSB's findings concerning a lack of rigorous compliance audits in the 2005 BP Texas City Refinery explosion" that killed fifteen plant workers); Chemical Disaster Rule, 82 Fed. Reg. at 4599 (citing, in a section titled "Events Leading to This Action," "[i]n addition to the tragedy . . . in West, Texas," "an explosion and fire at the Tesoro Refinery in Anacortes, Washington," a fire "at the Chevron Refinery in Richmond, California," and "a fire and explosion at Williams Olefins in Geismar, Louisiana."). Even were the court to agree for purposes of argument that the cause of the West, Texas disaster being arson is relevant to some of the accident-prevention provisions of the Chemical Disaster Rule, it is irrelevant to the emergency-response and information-sharing provisions, including those that have indisputably been delayed from the original March 14, 2018 effective date. Given that twelve of the fifteen fatalities in the West, Texas disaster were local volunteer firefighters and other first responders, this would be a fairly weak explanation for delaying provisions that EPA previously determined would help keep first responders safe and informed about emergency-response planning.

Because EPA has not engaged in reasoned decisionmaking, its promulgation of the Delay Rule is arbitrary and capricious.

\* \* \*

Accordingly, the court grants the petitions for review and vacates the Delay Rule.