**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC.,** | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 18-cv-1636 (TSC) |
| **ELIZABETH (BETSY) DEVOS, SECRETARY OF EDUCATION; JOHNNY W. COLLET, ASSISTANT SECRETARY FOR SPECIAL EDUCATION AND REHABILITATIVE SERVICES; U.S. DEPARTMENT OF EDUCATION,** | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

This decision resolves three motions currently pending before the court: (1) Defendants' Motion to Dismiss, ECF No. 14; (2) Plaintiff's Motion for Summary Judgment, ECF No. 16; and (3) Defendants' Cross-Motion for Summary Judgment, ECF No. 22.

Having reviewed the parties' filings, the record, and the relevant case law, the court, for reasons set forth below, hereby **DENIES** Defendants' Motion to Dismiss, ECF No. 14; **GRANTS** Plaintiff's Motion for Summary Judgment, ECF No. 16; **DENIES** Defendants' Cross-Motion for Summary Judgment, ECF No. 22; and **VACATES** "the Delay Regulation," Assistance to States for the Education of Children With Disabilities; Preschool Grants for Children With Disabilities, 83 Fed. Reg. 31306 (July 3, 2018).

## I.     BACKGROUND

### A.  IDEA

The Individuals with Disabilities Education Act ("IDEA") was enacted to improve educational outcomes for students with disabilities by "ensur[ing] that [they] receive needed special education services." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 748 (2017).  The statute requires States to implement various provisions or risk losing federal funding.  *See* 20 U.S.C. §§ 1411, 1412; Assistance to States for the Education of Children with Disabilities; Preschool Grants for Children With Disabilities, 81 Fed. Reg. 10968-01, 10970 (Mar. 2, 2016).

Congress has amended IDEA numerous times because of the over-representation of minority students in various special education programs.  *See, e.g.,* 20 U.S.C §§ 1400(c)(12)(B) ("More minority children continue to be served in special education than would be expected from the percentage of minority students in the general school population."); (C) ("African-American children are identified as having intellectual disabilities and emotional disturbance at rates greater than their White counterparts."); (D) ("In the 1998-1999 school year, African-American children represented just 14.8 percent of the population aged 6 through 21, but comprised 20.2 percent of all children with disabilities."); (E) ("Studies have found that schools with predominately White students and teachers have placed disproportionately high numbers of their minority students into special education.").  *See also* Compl. ¶¶ 30-50.

In 1997 Congress amended the IDEA after finding that "[g]reater efforts [were] needed to prevent the intensification of problems connected with mislabeling . . . among minority children with disabilities."  Pub. L. No. 105-17, § 601(c)(8)(A), 111 Stat. 37, 40 (1997).  This was the first time Congress "expressly identified racial over-representation in special education as a problem."  Compl. ¶ 51.  To address this problem, Congress required States to collect and

examine data to determine if significant disproportionality based on race was occurring in the identification and placement of students with disabilities, and to provide reviews and appropriate revisions of policies, practices, and procedures utilized in identifying students with disabilities. Individuals with Disabilities Education Act Amendments for 1997, Pub. L. No. 105-17, § 618(c), 111 Stat. 37, 102 (1997).

Seven years later, when reauthorizing and amending the IDEA, Congress expanded the significant disproportionality provisions beyond the identification and placement of children with disabilities to cover the "the incidence, duration, and type of disciplinary actions, including suspensions and expulsions." Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, § 618(d)(1)(C); 118 Stat. 2647, 2739 (2004). *See id.* § 618(d)(1)(A) (identification); *id.* § 618(d)(1)(B) (placement). If school districts (also referred to as local education agencies ("LEAs")) are identified as having significant disproportionality in any of these respects, States must: (1) "provide for the review and, if appropriate, revision of the policies, procedures, and practices used in such identification or placement;" *id.* § 618(d)(2)(A); (2) require school districts to spend 15% of their federal IDEA money "to provide comprehensive coordinated early intervening services to serve children in the local educational agency particularly children in those groups that were significantly overidentified;" *id.* § 618(d)(2)(B), *see id.* § 613(f); and (3) "require the local educational agency to publicly report on the revision of policies, practices, and procedures." *Id.* § 618(d)(2)(C).

## B. 2016 Regulations

From 2006 through 2016, the Department of Education's (hereinafter "the Department" or "the government") regulations implementing the IDEA gave States "the discretion to define [significant disproportionality] for the LEAs and for the States in general." Assistance to States

for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities, 71 Fed. Reg. 46540, 46738 (Aug. 14, 2006). This approach started to shift in 2014, when the Government Accountability Office ("GAO") reported that "the way some States defined overrepresentation made it unlikely that any districts would be identified." U.S. Gov't Accountability Office, GAO-13-137, Individuals with Disabilities Education Act: Standards Needed to Improve Identification of Racial and Ethnic Overrepresentation in Special Education (2013), https://www.gao.gov/products/GAO-13-137. The GAO recommended "a standard approach for defining significant disproportionality to be used by all states." *Id.* at 22.

In 2014, following the GAO report, the Department issued a Request for Information, 79 Fed. Reg. 35154 (June 19, 2014), because of "concern[] that the definitions and procedures for identifying LEAs with significant disproportionality that many States have established may set the bar so high that even LEAs with significant racial and ethnic disparities in the identification of children for special education are not identified as having significant disproportionality." *Id.* at 35155.

After considering the responses to the Request for Information, the Department issued a Notice of Proposed Rulemaking that would "require States to use a standard methodology . . . when making determinations of significant disproportionality." Notice of Proposed Rulemaking Regarding Assistance to States for the Education of Children With Disabilities; Preschool Grants for Children With Disabilities, 81 Fed. Reg. 10968, 10978 (Mar. 2, 2016). In response to comments, the Department revised the proposed regulations and adopted its final regulations in 2016. Final Regulation Regarding Assistance to States for the Education of Children With Disabilities; Preschool Grants for Children With Disabilities, 81 Fed. Reg. 92376, 92378 (Dec. 19, 2016) (hereinafter "2016 Regulations"). In issuing the 2016 Regulations, the Department

noted that "[m]any commenters" asserted that the proposed regulations "would put into place racial quotas that would interfere with the appropriate identification of children with disabilities based purely on the children's needs." *Id.* at 92385. The Department "recognize[d] the possibility that, in cases where States select particularly low risk ratio thresholds, LEAs may have an incentive to avoid identifying children from particular racial or ethnic groups in order to avoid a determination of significant disproportionality." *Id.* To counter that incentive, the Department explained that the final regulations "provide[] States the flexibility to set their own reasonable risk ratio thresholds, with input from stakeholders and State Advisory Panels." *Id.* This process, the Department believed, would "help States and LEAs to address large racial and ethnic disparities without undermining the appropriate implementation of child find procedures." *Id.* The Department further explained that "nothing in these regulations establishes or authorizes the use of racial or ethnic quotas limiting a child's access to special education and related services" and that "use of racial or ethnic quotas . . . would almost certainly conflict with the LEA's obligations to comply with other Federal statutes, including civil rights laws governing equal access to education" and "would almost certainly result in legal liability under Federal civil rights laws, including title VI of the Civil Rights Act of 1964 and the Constitution." *Id.* Moreover, the Department intended to "conduct an evaluation of the implementation of this regulation to assess its impact, if any, on how LEAs identify children with disabilities." *Id.* It explained that this evaluation would "include an examination of the extent to which school and LEA personnel incorrectly interpret the risk ratio thresholds and implement racial quotas in an attempt to avoid findings of significant disproportionality by States, contrary to IDEA." *Id.*

The 2016 Regulations set "common parameters for analysis, which each State must use to determine whether significant disproportionality is occurring at the State and local level." 81

Fed. Reg. at 92391. As part of this analysis, States were required to use "risk ratios" to analyze disparities across seven racial and ethnic groups and compare each group to the children in the school district in fourteen categories. *See* 81 Fed. Reg. 10968, 10973; 34 C.F.R. §§ 300.647(a)(6), (b)(2)–(4).[1] Plaintiff explains that "a risk ratio of 1.0 indicates that children from a given racial or ethnic group are no more or less likely than children from all other racial or ethnic groups to experience a particular outcome" and that, for instance, a risk ratio of 2.0 means that one groups is twice as likely to experience that outcome. Compl. ¶ 67. As previously mentioned, States were given "the flexibility to set their own reasonable risk ratio thresholds, with input from stakeholders and State Advisory Panels," 81 Fed. Reg at 92454, because the Department expected States to "work with stakeholders to identify particular risk ratio thresholds that help the State to address large racial and ethnic disparities without undermining the appropriate implementation of child find and evaluation procedures." *Id.* In explaining the benefit of this collaborative approach, the Department noted that

> it is important for States to take time to consult with their stakeholders and State Advisory Panels to ensure that, when setting risk ratio thresholds, they balance the need to identify significant disproportionality in LEAs with the need to avoid perverse incentives that would inhibit a child with a disability from being identified or placed in the most appropriate setting based on the determination of the IEP Team.

*Id.* at 92394.

The risk ratio threshold is the point at which disproportionality based on race or ethnicity can be determined to be significant. 34 C.F.R. § 300.647(a)(7). The regulation provides that if the risk ratio for a group exceeds the risk ratio threshold, then an LEA may be identified as significantly disproportionate. *Id.* § 300.647(b)(6). If "a determination of significant

---

[1] A "risk ratio is a calculation performed by dividing the risk of a particular outcome for children in one racial or ethnic group within an LEA by the risk for children in all other racial and ethnic groups within the LEA." 34 C.F.R. §300.647(a)(6).

disproportionality with respect to the identification of children as children with disabilities or the placement in particular educational settings" is made, the State must "review and, if appropriate, revis[e] . . .the policies, practices, and procedures used in identification or placement in particular education settings," *id.* § 300.646(c)(1). The LEA is required to "publicly report on the revision of policies, practices, and procedures," *id.* § 300.646(c)(2), and must "identify and address the factors contributing to the significant disproportionality," *id.* § 300.646(d)(1)(ii). Although the regulations took effect on January 18, 2017, the Department set the compliance date for States at July 1, 2018 to provide "States time to plan for implementing these final regulations, including to the extent necessary, time to amend the policies and procedures necessary to comply." 81 Fed. Reg. at 92378.

In addition to allowing States to set the risk ratio threshold applicable to their own school districts, subject to a requirement of reasonableness, 81 Fed. Reg. at 92388; 34 C.F.R. § 300.647(b)(1)(i), (b)(1)(iii)(B), the regulations gave States discretion in two additional respects. First, States had flexibility to determine when there were sufficient children in a particular racial or ethnic group to permit application of the regulation's methodology. 34 C.F.R. §§ 300.647(a)(3), (4). Second, States had discretion not to identify as significantly disproportionate if the risk ratio for a racial or ethnic group in the relevant category had not exceeded the risk ratio threshold for three prior consecutive years, or if the district had demonstrated reasonable progress in lowering its risk ratio for the group in each of the two prior years. 34 C.F.R. §§ 300.647(d)(1), (2).

**C. The 2018 Postponement of the 2016 Regulations – The "Delay Regulation"**

In February 2018 the Department issued a Notice of Proposed Rulemaking, proposing to "postpone the compliance date [of the 2016 Regulations] by two years, from July 1, 2018 to July

1, 2020." Assistance to States for the Education of Children With Disabilities; Preschool Grants for Children With Disabilities, 83 Fed. Reg. 8396 (Feb. 27, 2018). In seeking public comment, the Department noted it would "consider comments on proposed delayed compliance dates only and [would] not consider comments on the text or substance of the final regulations." *Id.* In July 2018, citing concerns that the 2016 Regulations "may create an incentive for LEAs to establish de facto quotas," the Department issued its final rule postponing the compliance date of the 2016 Regulations by two years. Final Rule Delaying Compliance Date Regarding Assistance to States for the Education of Children With Disabilities; Preschool Grants for Children With Disabilities, 83 Fed. Reg. 31306, 31308 (July 3, 2018) (hereinafter the "Delay Regulation"). In support of the delay, the Department argued that data from Texas corroborated its concern that the 2016 Regulations could incentivize LEAs to employ de facto quotas. *Id.* at 31308, 31311. The Department decided it was "more prudent to delay the compliance date [of the 2016 Regulations] and address that concern through a review of the standard methodology before States [were] required to implement the regulations rather than during implementation." *Id.* at 31310. The Delay Regulation, however, allowed States to use the standard methodology from the 2016 Regulations. *Id.* at 31309 ("States may implement the standard methodology or may use any methodology of their choosing to collect and examine data to identify significant disproportionality in their LEAs until the Department evaluates the regulations and issues raised in this rulemaking."). Indeed, the Department predicted that when the Delay Regulation went into effect, many States would implement the standard methodology. *Id.* at 31312 ("States may, and many States have commented that they intend to, implement the standard methodology in the 2016 significant disproportionality regulations even if the Department delays these regulations.").

## D. Plaintiff's Lawsuit

Plaintiff Council of Parent Attorneys and Advocates, Inc. ("COPAA") is a "national not for-profit organization of parents of children with disabilities, their attorneys, and their advocates," whose mission is "to protect and enforce the legal and civil rights of students with disabilities and their families." Compl. ¶ 12. COPAA advances its mission by:

> providing resources, training, and information to parents, advocates, and attorneys to assist them in obtaining the equal educational opportunity to which children with disabilities are entitled under the federal civil rights laws, including the IDEA; educating members of the public and policy makers, including federal agencies, about the educational experiences of children with disabilities and their families (including the intersection of race and disability); and educating COPAA members about developments in the federal civil rights laws and policies affecting education of children with disabilities.

*Id.* ¶ 14. To help prepare its educational materials, COPAA relies "on information and research it collects about what school districts are doing with regard to disability and race, including how States identify school districts as significantly disproportionate and how school districts respond (with or without their states' assistance) to determinations of significant disproportionality." *Id.* ¶ 17. COPAA relies heavily on reports and analyses generated after school districts are identified as significantly disproportionate, including publicly available reports of revisions to school districts' policies, practices, and procedures, and analyses of identifying factors contributing to the significant disproportionality determinations, known as "root-cause analyses." Compl. ¶ 119; 34 C.F.R. §§ 300.646(c)(2), (d)(1)(ii). COPAA claims these "reports and analyses are an important source of information relied upon by COPAA in preparing educational materials, in adopting policy positions, and in advocating on behalf of children before federal agencies." Compl. ¶ 119.

On July 3, 2018 the Department published the Delay Regulation in the Federal Register. Nine days later, COPAA filed suit, requesting that this court declare the Delay Regulation

unlawful; vacate and set aside the Delay Regulation; enjoin the Department of Education and its officers, employees, and agents from implementing the Delay Regulation; award COPAA its reasonable costs and attorney's fees incurred in the prosecution of this action; and award such other equitable and further relief as this court deems just and proper. Compl. ¶ 133.

COPAA claims, among other injuries, that the Delay Regulation will "reduce the number of school districts that are identified as significantly disproportionate in the 2018-19 school year compared to what would occur if compliance with the 2016 Final Regulations were required for the 2018-19 school year in all States." Compl. ¶ 116. COPAA asserts that the reduction "will have certain inevitable consequences that will injure COPAA, its members, and students," *id.* ¶ 117; that it will "reduce the number of school districts that must engage in a review of their policies, practices, and procedures," *id.* ¶ 118, and "reduce the amount of information available to COPAA and its members," *id.* ¶ 119. *See* Plaintiff's Opposition to Defendants' Motion to Dismiss and Plaintiff's Motion for Summary Judgment, ECF No. 16 at 9 ("Pl.'s Opp'n to Defs.' Mot. to Dismiss and Pl.'s Mot. for Summ. J.") ("The two-year delay of the 2016 Regulations hampers COPAA's public education activities by reducing the amount of information available to it about significant disproportionality at the state and local levels compared to what it would have received under the 2016 Regulations."). COPAA further asserts that some of its members will be individually harmed by the Delay Regulation because they have children "enrolled in school districts that would have been identified as significantly disproportionate absent the Delay Regulation." *Id.* These parents, COPAA maintains, "have lost important practical services that would have flowed from a determination of disproportionality, including an automatic review provided by the state of the policies, practices and procedures—including individual review of their child's identification, placement, or discipline—and mandatory revisions of any illegal

practices," *id.* at 9-10, and "the opportunity for their district[s] to engage in a root-cause analysis to ensure that the comprehensive coordinated early intervening services ("CEIS") are used toward reducing such disparities," *id.* at 10 (citing Compl. and Almazan, Adams, Cone, and Gerland Affidavits).

Defendants have moved to dismiss for lack of standing, and both parties have moved for summary judgment.

## II.    MOTION TO DISMISS

### A.  Legal Standard

A motion pursuant to Federal Rule of Civil Procedure 12(b)(1) "presents a threshold challenge to the court's jurisdiction." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The plaintiff bears the burden of establishing the elements of standing, *id.* at 561, and each element "'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation.'" *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Lujan*, 504 U.S. at 561). The plaintiff must "show a 'substantial probability' that it has been injured, that the defendant caused its injury, and that the court could redress that injury." *Sierra Club v. E.P.A.*, 292 F.3d 895, 899 (D.C. Cir. 2002) (citation omitted). With respect to a facial 12(b)(1) motion to dismiss, the court must "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). At the summary judgment stage, the plaintiff "must support each

element of its claim to standing by affidavit or other evidence." *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 48 n.2 (D.C. Cir. 2016).

Under the law of this Circuit, COPAA "'can assert standing on its own behalf, on behalf of its members, or both.'" *PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)). In asserting standings on its own behalf, i.e., organizational standing, COPAA must, "like an individual plaintiff," show "[1] actual or threatened injury in fact [2] that is fairly traceable to the alleged illegal action and [3] likely to be redressed by a favorable court decision." *Id.* (quotation marks and citations omitted). In asserting standing on behalf of its members, i.e., associational standing, COPAA must show "(1) at least one of its members has standing in its own right, (2) the interests [it] seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual . . . member in the suit." *Interstate Nat. Gas Ass'n of Am. v. FERC*, 494 F.3d 1092, 1095 (D.C. Cir. 2007) (citation omitted).

## B. Organizational Standing

### 1. Injury in Fact

COPAA claims that the Delay Regulation has denied it the information it would have received if the 2016 Regulations had not been delayed. An Article III injury in fact occurs if the government cuts off information that legally must be publicly disclosed. "[A] plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998) (citations omitted). "To establish such an injury, a plaintiff must espouse a view of the law under which the defendant (or an entity it regulates) is obligated to disclose certain information that the plaintiff has a right to obtain." *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 23 (D.C. Cir. 2011).

The D.C. Circuit has set forth well-established principles for determining standing. In *Action All. of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 935 (D.C. Cir. 1986), plaintiffs were "four organizations that endeavor[ed], through informational, counseling, referral, and other services, to improve the lives of elderly citizens." *Id.* They sued the Department of Health and Human Services (HHS), alleging that HHS's regulation "significantly restrict[ed]," the flow of "information regarding services available to the elderly" that, if possessed by plaintiffs, "would enhance [their] capacity . . . to refer members to appropriate services and to counsel members when unlawful age discrimination may have figured in[to] a benefit denial." *Id.* at 937. The D.C. Circuit found that the plaintiffs established standing, because the regulations kept plaintiffs from "access to information and avenues of redress they wish[ed] to use in their routine information-dispensing, counseling, and referral activities. Unlike the mere 'interest in a problem' or ideological injury in *Sierra Club* [*v. Morton*, 405 U.S. 727, 739 (1972)], plaintiffs had "alleged inhibition of their daily operations, an injury both concrete and specific to the work in which they [were] engaged." *Id.* at 937-38 (quotation marks omitted) (footnote omitted).

In *PETA*, Plaintiff, an animal rights organization, sued the USDA, asking the court to order USDA to "extend enforcement of the AWA [Animal Welfare Act] to birds covered by the AWA, by enforcing the general AWA standards that presently exist." 797 F.3d at 1091 (quotation marks omitted) (footnote omitted). PETA claimed that USDA's failure to investigate allegations of bird mistreatment denied the public reports of those alleged instances, and that PETA used the information in the reports to educate its members and the public. *Id.* at 1095, 1096. The district court found that PETA had standing because USDA's decision not to apply the AWA to birds "precluded PETA from preventing cruelty to and inhumane treatment of these

animals through its normal process of submitting USDA complaints and it deprived PETA of key information that it relies on to educate the public." *Id.* at 1094 (quotation marks and citation omitted). The D.C. Circuit affirmed, noting that "[t]he key issue is whether PETA has suffered a concrete and demonstrable injury to [its] activities, mindful that, under our precedent, a mere setback to [PETA's] abstract social interests is not sufficient." *Id.* at 1093 (second alteration in original) (quotation marks and citations omitted). The Circuit explained that in determining "whether an organization's injury is concrete and demonstrable," a court asks "first, whether the agency's action or omission to act injured the [organization's] interest and, second, whether the organization used its resources to counteract that harm." *Id.* at 1094 (alteration in original) (quotation marks and citations omitted). Applying these standards, the Court found that PETA's alleged injuries were "materially indistinguishable from those alleged by the organizations in *Action Alliance*[]." *Id.* It held that the "USDA's allegedly unlawful failure to apply the AWA's general animal welfare regulations to birds has perceptibly impaired PETA's ability to both bring AWA violations to the attention of the agency charged with preventing avian cruelty and continue to educate the public." *Id.* at 1095 (quotation marks and brackets omitted). PETA established organizational standing because it had expended resources to counter its injuries. *Id.*

In *Waterkeeper All. v. EPA*, 853 F.3d 527, 530 (D.C. Cir. 2017), plaintiffs challenged an EPA regulation that "generally exempt[ed] farms from [statutory] reporting requirements for air releases from animal waste." The Court of Appeals found here, too, that the challenged regulation inflicted "informational injury." *Id.* at 533. Invoking the rule "that the plaintiff must assert 'a view of the law under which the defendant (or an entity it regulates) is obligated to disclose certain information that the plaintiff has a right to obtain,'" *id.* (quoting *ASPCA*, 659 F.3d at 22-23), the Court explained that the question is "whether a reporting mandate under

CERCLA triggers a requirement of public disclosure. If so, exempting a release from the mandate extinguishes the corresponding disclosure." *Id.* The Court held "the EPA's allegedly unlawful CERCLA exemption reduces the information that must be publicly disclosed under EPCRA. As a result Waterkeeper (and others) who previously sought that information no longer have a statutory right to access it. For the purpose of standing, that's injury enough." *Id.*

This trio of cases – *Action Alliance*, *PETA*, and *Waterkeeper* – controls this court's decision. The Delay Regulation prevents COPAA from receiving information to which it is legally entitled. Because 20 U.S.C. § 1418(b)(1) directs States to "publicly report[]" information that the Department requires they collect, States must publicly disclose the significant disproportionality designation of LEAs. *See* 83 Fed. Reg. at 31313 ("States will continue to report to the Department and the public whether each LEA was identified with significant disproportionality and the category or categories of analysis under which the LEA was identified."). The IDEA also requires States to publicly disclose revisions made to LEAs' policies, procedures, and practices. 20 U.S.C. § 1418(d)(2)(C); 34 C.F.R. § 300.646(c)(2).

COPAA has convincingly shown that the Delay Regulation deprives it of information it would have received if the 2016 Regulations had gone into effect, that this information would assist it, including with educating its members and the public, and that it has expended resources counteracting the loss of information.

First, COPAA explains that to fulfill its mission "to protect and enforce the legal and civil rights of students with disabilities and their families," Compl. ¶ 12, it relies on information related to significant disproportionality. Specifically:

> COPAA relies on information and research it collects about what school districts are doing with regard to disability and race, including how States identify school districts as significantly disproportionate and how school districts respond (with or without their states' assistance) to determinations of significant disproportionality.

*Id.* ¶ 17; *see also* Almazan Aff. ¶ 6 ("In conducting these activities to fulfill its mission, including its public education activities, COPAA relies on public information and research it collects about what school districts are doing with regard to disability and race, including how States identify school districts as significantly disproportionate and how school districts respond (with or without their States' assistance) to determinations of significant disproportionality, including revising policies, practices, and procedures and spending their IDEA funds on comprehensive coordinated early intervention services.").

Second, COPAA explains "[t]he delay in the compliance date will necessarily reduce the amount of information available to COPAA and its members because it will reduce the number of school districts determined to be significantly disproportionate and, in turn, reduce the number of school districts subject to two information-generating provisions of the IDEA and the 2016 Final Regulations." Compl. ¶ 119. COPAA identifies two types of information that it will lose: "first, a report, which will be made publicly available, of revisions, if any, of the school district's policies, practices, and procedures, 34 C.F.R. § 300.646(c)(2); and second, an analysis that identifies the factors contributing to the significant disproportionality, *i.e.*, a root–cause analysis, *id.* § 300.646(d)(1)(ii)." *Id.* COPAA explains that "[t]hese reports and analyses are an important source of information relied upon by [it] in preparing educational materials, in adopting policy positions, and in advocating on behalf of children before federal agencies." *Id.*; *see also* Almazan Aff. ¶ 8.

Third, COPAA demonstrates that the information it will be deprived of is of the type "on which it relies to educate its members and the public" and that it uses that information as part of its "routine information–dispensing activities." *Id.* ¶ 120. COPAA explains that this, in turn, prevents its members from "learn[ing] what school districts that would otherwise be determined

to be significantly disproportionate under the 2016 Regulations are doing." *Id*.; *see also*

Almazan Aff. ¶¶ 8-12.

Fourth, COPAA explains that the loss of information will necessarily result in the

additional expenditure of revenues.

> [I]n order to continue to educate the public, policy makers, and its members, COPAA will have to find the same information elsewhere. Such efforts include independent investigation and public records requests to numerous states and LEAs; researching the labyrinth of state significant disproportionality formulas and thresholds; and reaching out to parents directly. These more costly methods hardly guarantee the same information, impairing COPAA's ability to provide the same robust guidance to the public and its members.

Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss and in Supp. of Pl.'s Mot for Summ. J. at 14

(citations omitted). *See also* Almazan Aff. ¶ 15; Compl. ¶ 122.

COPAA demonstrates that even its own independent research efforts will not provide

access to the same quality of information that would be available under the 2016 Regulations. It

explains that the "Department of Education does not make publicly available data that would

allow COPAA to calculate racial disparities in identification, placement, and discipline of

students with disabilities at the school district level disaggregated by disability type (as opposed

to as the state level)." Almazan Aff. ¶ 7. Similarly, "in virtually all States, there is very little

public data available that would allow COPAA to calculate racial disparities in identification,

placement and discipline of students with disabilities at the school district level." *Id.* Therefore,

COPAA "relies on the determinations of significant disproportionality announced by the States

in determining which school districts have the most significant racial disparities in the State and

consequently are in most need of COPAA's monitoring and education functions." *Id.* ¶ 8.[2]

---

[2]The government claims that, because States maintain considerable discretion "under the 2016 Regulations, Plaintiff will still lack comparable information on racial disproportionality . . .

In sum, because COPAA's alleged injury—i.e., denial of access to significant disproportionality information—is "concrete and specific to the work in which [it is] engaged," and because it has expended resources to counter that injury, COPAA has alleged a cognizable injury sufficient to support organizational standing. *PETA*, 797 F.3d at 1095.[3]

The government argues on several fronts that COPAA fails to establish organizational standing. First, it contends that the underlying premise of COPAA's injury-in-fact argument – "that ED's postponement of the compliance date for the 2016 regulations will result in fewer school districts being identified with significant disproportionality than would have occurred absent the postponement" – is "speculative." Defendants' Motion to Dismiss at 19, ECF No. 14 ("Defs.' Mot. to Dismiss"); *see also id.* at 3, 14, 18, 23, 28, 31. "Plaintiff simply assumes without any factual basis that States would have chosen to implement the 2016 Regulations in such a way as to result in more school districts being identified with significant disproportionality," and therefore COPAA's alleged injuries are "conjectural and hypothetical, as

---

[because] the amount and types of information made available through school districts' reports will still necessarily vary." Defendants' Reply in Support of Motion to Dismiss at 13, ECF No. 19 ("Defs.' Reply in Supp. of Mot. to Dismiss") (quotation marks omitted). The government's prior statements undercut its current assertion. In 2018, the government stated that "the only benefits we believe could be reasonably argued to be delayed as a result of this regulatory action would be the reduction in the use of inappropriate policies, practices, and procedures, and the increased comparability of data across States." 83 Fed. Reg. at 31316. The government said the same in 2016. *See* 81 Fed. Reg. at 92457 ("The Department believes this regulatory action to standardize the methodology States use to identify significant disproportionality will provide clarity to the public, increase comparability of data across States . . . [and] will accrue benefits to stakeholders in reduced time and effort needed for data analysis and a greater capacity for meaningful advocacy."); *see also id.* at 92386, 92407. Therefore, the Delay Regulation hampers Plaintiff's ability to conduct comparability assessments of data across States.

[3] There is reason to believe that for informational standing COPAA does not need to demonstrate a diversion of resources. *See, e.g., Campaign Legal Center v. FEC*, 245 F. Supp. 3d 119, 127–128 (D.D.C. 2017). But the court need not decide this question because COPAA has shown that the Delay Regulation has forced it to expend resources trying to collect the information.

opposed to actual or imminent," *id.* at 20.  The essence of the government's argument is that the likelihood of fewer school districts being identified "depends on the independent actions of entities not before the Court and not parties to this litigation . . . ," *id.*, and those entities have wide latitude in implementing the regulations.  In particular, States had three types of discretion in implementing the 2016 Regulations: (1) States could set a reasonable risk ratio threshold applicable to their own schools districts, 81 Fed. Reg. at 92388; 34 C.F.R. §§ 300.647(b)(1)(i), (b)(1)(iii)(B); (2) States had flexibility to determine when there were sufficient children in a particular racial or ethnic group to permit application of the regulations' methodology in the first instance, 34 C.F.R. §§ 300.647(a)(3), (4); and (3) States had discretion not to identify an LEA as significantly disproportionate if the risk ratio for a racial or ethnic group in the relevant category of analysis had not exceeded the risk ratio threshold for three prior consecutive years or if the district had demonstrated reasonable progress in lowering its risk ratio for the group in the relevant category of analysis in each of the two prior years, 34 C.F.R. §§ 300.647(d)(1), (2).  This discretion, the government argues, renders any prediction about whether the 2016 Regulations would have led to more schools being identified as significantly disproportionate as an exercise in speculation.  Defs.' Mot. to Dismiss at 23.

In further support of this argument, the government also points to the fact that when it issued the 2016 final regulations, the Department admitted that it was uncertain "how many LEAs would be newly identified in future years, particularly given the wide flexibilities provided to States in the final regulations," 81 Fed. Reg. at 92388, and that it was "possible that these regulations may not result in any additional LEAs being identified as having significant disproportionality." *Id.* at 92458.  Finally, the government argues that Plaintiff has not proffered "markers or allegations to suggest how the States intended to implement the 2016 Regulations,

or how they intend to act following postponement of the compliance date." Defs.' Mot. to Dismiss at 26.

The government's own statements undermine its argument that an increase in LEAs being identified as significantly disproportionate is speculative. Indeed, these statements demonstrate that an increase in the number of LEAs found to be significantly disproportionate was likely had the 2016 Regulations gone into effect. Although the Department said that it is possible that these regulations may not result in any additional LEAs being identified as having significant disproportionality, it found this outcome "unlikely" and that "400 LEAs above baseline represents the most reasonable estimate of the likely costs associated with these final rules." 81 Fed. Reg. at 92458, 92462. In a similar vein, when the Department promulgated the Delay Regulation, it estimated there would be fewer LEAs identified as having significant disproportionality. *See* 83 Fed. Reg. at 31316 ("[W]e also estimate that 150 additional LEAs will be identified with significant disproportionately in Year 1 [2018-2019], 220 in Year 2 [2019-2020], and 400 in Year 3 [2020-2021]."). While the court notes that these projections were not made "with a high degree of certainty," 81 Fed. Reg. at 92388, COPAA's "burden of proof is not to demonstrate certainty but to show a *substantial probability*" of injury. *In re Idaho Conservation League*, 811 F.3d 502, 508 (D.C. Cir. 2016) (quotation marks and citation omitted) (emphasis in original). Moreover, although the government now argues that these estimates were "proffered without explanation or analytical support," Defs.' Reply in Supp. of Mot. to Dismiss at 1, this claim is undercut by the government's pre-litigation statement that its estimates were based on "the expertise of its staff members and relevant external sources." Adams Decl. II ¶ 37, Plaintiff's Reply in Support of its Motion for Summary Judgment and Opposition to Defendants' Cross-Motion for Summary Judgment, ECF No. 25 at 5 ("Pl.'s Reply Supp. Mot.

for Summ. J. and Opp'n to Defs.' Cross-Mot. for Summ. J.") (quoting an e-mail from Ms. Hill, the Department of Education Press Secretary).

Furthermore, information from three states that have not implemented the 2016 Regulations – Colorado, Missouri, and South Dakota – shows that had they done so, more LEAs would have been identified. The Colorado Department of Education "did not expect to identify any districts as significantly disproportionate in the 2018-19 school year under the non-federal methodology Colorado has opted to use instead of the 2016 federal regulations." Adams Decl. I ¶ 5, Pl.'s Opp'n to Defs.' Mot. to Dismiss and Pl.'s Mot. for Summ. J., Ex. E. "[F]ive LEAs . . . would have been identified as significantly disproportionate for the 2018-19 school year under the 2016 federal regulations." *Id.* ¶ 6. Missouri did not expect to identify any LEAs using its methodology, while predicting it would have identified 33 school districts as significantly disproportionate for the 2018-19 school year if using the 2016 Regulations. *Id.* ¶¶ 15, 16. South Dakota reported that under its methodology, one school district would likely be identified as significantly disproportionate. *Id.* ¶ 21. Under the 2016 Regulations, South Dakota would have identified ten. *Id.* ¶ 22. This information from the States shows that the likelihood of increased identification of LEAs as significantly disproportionate if the 2016 Regulations had gone into effect is not speculative.[4]

The government also contends that COPAA's informational injury is speculative, because the likelihood of additional information being publicly reported would require a school

---

[4] The government nonetheless argues that the States' own reporting was "uncertain," and that "States did not indicate whether they did or would exercise any of the discretion afforded to them under the 2016 Regulations." Defs.' Reply in Supp. of Mot. to Dismiss at 5-6. However, COPAA confirmed with Missouri, South Dakota and Colorado that they "took into account all the flexibilities permitted by the Final Regulations when the department identified school districts as significantly disproportionate." Adams Decl. II ¶ 3; *see also id.* ¶¶ 14-15.

district to determine that a change to its "policies, practices, or procedures" is necessary for compliance and then actually make a change. Defs.' Mot. to Dismiss at 43 (citing 34 C.F.R. § 300.646(c)(2)). Again, the government's prior statements refute its current argument. In promulgating the 2016 Regulations, the government estimated that "half of the new LEAs identified with significant disproportionality . . . would need to revise their policies, practices, and procedures." 81 Fed. Reg. at 92461. This estimate remained unchanged when the government adopted the Delay Regulation. 83 Fed. Reg. at 31316.

The government next argues that COPAA is in the same position it has always been in and cannot show any injury to its daily operations and activities because the regulations' compliance date was postponed, and so school districts were never required to adopt the standard methodology. Defs.' Mot. to Dismiss at 29. This argument is misplaced because the compliance date for the 2016 Regulations was July 1, 2018, two days before the Delay Regulation was published in the Federal Register. Moreover, "the baseline for measuring the impact of a change or rescission of a final rule is the requirements of the rule itself, not the world as it would have been had the rule never been promulgated." *Air All. Hous. v. EPA*, 906 F.3d 1049, 1068 (D.C. Cir. 2018). The government's argument that COPAA cannot show injury because it did not previously have access to the increased information about significant disproportionality is inconsistent with both *PETA* and *Action Alliance*. In those cases, the Court of Appeals found injury in fact even though plaintiffs claimed an entitlement to information to which they previously did not have access. *See PETA*, 797 F.3d at 1089 ("Although the Agency has taken steps to craft avian-specific animal welfare regulations, it has yet to complete its task after more than ten years and, during the intervening time, it has allegedly not applied the Act's general animal welfare regulations to birds."); *Action Alliance*, 789 F.2d at 937.

The government further contends that none of the cases on which COPAA relies "involves an alleged informational injury that arises from the Government's non-regulation of non-parties to the litigation and which is therefore contingent on how third-party actors will exercise their discretion." Defendants' Reply in Support of Motion to Dismiss, ECF No. 19 at 9 (Defs.' Reply in Supp. of Mot. to Dismiss). However, in *Waterkeeper,* a statute required certain private entities to notify state or local governments if the entities released hazardous substances into the environment. 853 F.3d at 534. The state or local government was required to make the "followup emergency notices" from the entity available to the public. *Id.* (internal brackets and quotation marks omitted). A federal agency sought to exempt certain entities from the reporting requirement, and the Court of Appeals held that petitioners had standing to challenge the exemption because it "reduces the information that must be publicly disclosed." *Id.* at 533. Petitioners did not have to show how many local and state governments would comply with the disclosure requirements, or how many emergency notices would be submitted by exempted third parties to local and state governments. The Court concluded that petitioners had informational standing, even though the production of information required the involvement of two sets of parties not before the court.[5]

---

[5] The government argues that Plaintiff's inability to obtain "root-cause analyses" cannot create standing, because Plaintiff does not have a statutory right to that information. *See, e.g., PETA*, 797 F.3d at 1103 (Millett, J., concurring dubitante); *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). The court need not decide this question, because COPAA adequately alleges informational harm based on the loss of information on disproportionality designations, to which COPAA has a legal right. *See* 20 U.S.C. §§ 1418(b)(1), (d)(2); 83 Fed. Reg. at 31313; 34 C.F.R. § 300.646(c)(2).

2.  Causation and Redressability

The causation element of standing requires "a fairly traceable connection between the plaintiff's injury and the complained-of conduct." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (citation omitted).  Because the 2016 Regulations required States to use a standard methodology, but for the Delay Regulation COPAA would have the information it seeks.  Therefore, COPAA has satisfied the causation element.  To satisfy the redressability requirement, COPAA must show "a likelihood that the requested relief will redress the alleged injury." *Id.*  COPAA does not have "'to *prove* that granting the requested relief is *certain* to alleviate' [its] injury." *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 811 (D.C. Cir. 1983) (quoting *Cmty. Nutrition Inst. v. Block*, 698 F.2d 1239, 1248 (D.C. Cir. 1983), *rev'd on other grounds*, 467 U.S. 340 (1984)) (emphasis in original).  If this court vacates the Delay Regulation, the 2016 Regulations will likely provide COPAA access to the information it seeks.  Therefore, COPAA has satisfied the redressability element.[6]

**C.  Associational Standing**

A plaintiff asserting associational standing must show that "(1) at least one of its members has standing in its own right, (2) the interests [plaintiff] seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual . . . member in the suit." *Interstate Nat. Gas Ass'n of Am. v. FERC*, 494 F.3d 1092, 1095 (D.C. Cir. 2007) (citation omitted).   Based on the record before it, the court finds that COPAA has satisfied this standard.

---

[6] The government's argument on causality and redressability relies on its erroneous conclusion that the likelihood of more LEAs being identified as significantly disproportionate if the 2016 Regulations were implemented is only speculative.  *See* Defs.' Mot. to Dismiss at 41-43.

In its Cross-Motion for Summary Judgment, *see* Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss and in Supp. of Pl.'s Mot for Summ. J., COPAA identified two members, Cone and Gerland, whose children are enrolled in LEAs in States where, but for the Delay Regulation, the LEAs would have been identified as significantly disproportionate. *See* Almazan Aff. ¶ 21; Adams Aff. ¶¶ 3-7; Cone Aff. ¶¶ 3-5, 7-8; Gerland Aff. ¶¶ 3-7.[7]

These individual members suffered two types of injuries caused by the Delay Regulation: First, they suffered informational injuries because the loss of the disproportionality information undercuts their ability to keep abreast of important developments that shape their children's education under the IDEA, such as picking school districts and coordinating individual educational plans. *See, e.g.*, Cone Aff. ¶ 8; Gerland Aff. ¶ 7. "[W]e have recognized that a denial of access to information can work an injury in fact for standing purposes, at least where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them." *ASPCA v. Feld Entm't, Inc.*, 659 F.3d at 22 (citations and quotation marks omitted). Members also suffered an injury because they lost the opportunity to adjust and correct their children's treatment. A failure to designate their LEAs as significantly disproportionate denies members an automatic

---

[7] Cone and Gerland were not identified in COPAA's Complaint, and the government argued that this fact was fatal to COPAA's associational standing argument. *See* Defs.' Mot. to Dismiss at 38-39. Cone and Gerland were subsequently identified through affidavits in COPAA's motion for summary judgment, after which the government ceased to press its argument. Although the D.C. Circuit has not held that a plaintiff need not identify an affected member by name at the pleading stage, numerous other courts have so found. *See, e.g., Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 31 (D.D.C. 2012) (collecting cases and stating that at the pleading stage "the plaintiff need not identify an affected member by name"). The court finds that the addition of Cone and Gerland's names in pleadings filed after the Complaint was sufficient.

state review to identify students who are misidentified, misplaced, or improperly disciplined. *See* Cone Aff. ¶¶ 6-7; Gerland Aff. ¶ 7. As a result, these members are deprived of the beneficial effect of these reviews, which would lead to corrections and improvements to their children's education.

Second, COPAA seeks to protect and enforce the legal and civil rights of students with disabilities and their families. *See* Compl. ¶ 12. COPAA's litigation goals in this suit are "germane" to this mission. This requirement is not demanding, requiring "only that an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together." *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 56 (D.C. Cir. 1988) (footnote omitted).

Third, COPAA's members do not have to participate in the litigation for this court to issue injunctive and declaratory relief. *See id. at* 53 ("[T]he declaratory and injunctive relief requested by [the plaintiff organization] is clearly not of a type that requires the participation of any individual member."); *see also id.* at n.8.

The government contends that the fact that Cone and Gerland "would *read* school district reports issued under 34 C.F.R. § 300.646(c) does not . . . demonstrate that the absence of those reports has or will imminently *undermine their parental involvement* . . . ." Defs.' Reply in Supp. of Mot. to Dismiss at 16 (emphasis in original). But the Supreme Court rejected this argument in *Havens Realty*:

> As we have previously recognized, [t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing. Section 804(d), which, in terms, establishes an enforceable right to truthful information concerning the availability of housing, is such an enactment. A tester who has been the object of a misrepresentation made unlawful under § 804(d) has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions. That the tester may have approached the real estate agent fully expecting that he would receive false

information, and without any intention of buying or renting a home, does not negate the simple fact of injury within the meaning of § 804(d).

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982) (alteration in original) (quotation marks and citations omitted).

The government also denies that COPAA's members are injured by the loss of automatic reviews because the IDEA and the Department do not require those reviews to "identify *individual instances* of student misidentification, misplacement, or improper discipline." Defs.' Reply in Supp. of Mot. to Dismiss at 17 (emphasis in original). This argument ignores case law holding that losing the opportunity to review the child's school district is injury enough. "We have held that 'a plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* . . . even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity.'" *Teton Historic Aviation Found. v. U.S. Dep't of Defense.*, 785 F.3d 719, 724 (D.C. Cir. 2015) (quoting *CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989) (emphasis in original)).

For the reasons discussed above, the court finds that COPAA has proven both organizational and associational standing. Because the court is denying the government's motion to dismiss, it will now address the parties' cross-motions for summary judgment.

## III. SUMMARY JUDGMENT

### A. Legal Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a plaintiff challenges an agency's final action under the Administrative Procedure Act ("APA"), summary judgment "is the mechanism for deciding whether as a matter

of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C. 2016) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)).

The APA requires courts to "hold unlawful and set aside" an agency's action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). The court's role is to "consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (quotation marks and citations omitted). An agency must provide a satisfactory explanation for departing from its prior position. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he agency must show that there are good reasons for the new policy.").

## B. Analysis

The court finds that the Department of Education violated the APA in two ways. First, it failed to provide a reasoned explanation for delaying the 2016 Regulations. Second, it failed to consider the costs of delay, rendering the Delay Regulation arbitrary and capricious.[8]

---

[8] COPAA argues the Delay Regulation is arbitrary and capricious for two additional and independent reasons: (1) the government failed to consider reasonable alternatives; and (2) the government failed to provide for meaningful participation in the rulemaking. *See* Pl.'s Opp'n to Defs.' Mot. to Dismiss and Pl.'s Mot. for Summ. J. at 39-45. Because the court finds that the government's failure to provide a reasoned explanation and its failure to consider costs render the Delay Regulation arbitrary and capricious, it will not reach these two arguments.

## 1. The Government Failed to Provide a Reasoned Explanation

The government implemented the Delay Regulation because it was concerned that the 2016 Regulations could incentivize LEAs to use racial quotas to avoid findings of significant disproportionality. This decision did not have adequate support in the rulemaking record.

The issue of the 2016 Regulations acting as an incentive for racial quotas was thoroughly discussed and dealt with years before 2018, when the government cited it as the basis for implementing the Delay Regulation. In adopting the 2016 Regulations, the government responded to comments arguing that the regulations "would create an incentive [for LEAs] to not identify children for special education and related services in order to reduce disproportionality numbers," 81 Fed. Reg. at 92454, by acknowledging this possibility, but concluded that it was limited to States that selected "particularly low risk ratio thresholds." *Id.* ("[T]he Department recognizes the possibility that, in cases where States select particularly low risk ratio thresholds, LEAs may have an incentive to avoid identifying children from particular racial or ethnic groups in order to avoid a determination of significant disproportionality.").

Although the government in 2016 found this danger to be smaller than some commenters proposed, it nonetheless worked to address them in the final regulations. The preamble to the final 2016 Regulations condemned the use of racial quotas. *Id.* at 92381 ("[N]othing in these regulations establishes or authorizes the use of racial or ethnic quotas limiting a child's access to special education and related services."). The government expressly stated that the use of quotas violates the IDEA. *Id.* at 92393 ("[I]t is a violation of IDEA for LEAs to attempt to avoid determinations of significant disproportionality by failing to identify otherwise eligible children as children with disabilities."). The preamble also warned that the use of quotas would expose an LEA to various forms of legal liability. *See id.* at 92381 ("[A]n LEA's use of quotas to

artificially reduce the number of children who are identified as having a disability, in an effort to avoid a finding of significant disproportionality, would almost certainly conflict with their obligations to comply with other Federal statutes, including civil rights laws governing equal access to education."); *id.* at 92385 ("[T]he establishment of any such quotas would almost certainly result in legal liability under Federal civil rights laws, including title VI of the Civil Rights Act of 1964 and the Constitution."). And the government stated that it had "added a new § 300.646(f) to make clear that these regulations do not authorize a State or an LEA to develop or implement policies, practices, or procedures that result in actions that violate any IDEA requirements." *Id.*

The government implemented additional safeguards beyond these warnings. Because the government found that States which "select particularly low risk ratio thresholds," *id.*, were most likely to be incentivized to use quotas, the 2016 Final Regulations "provide[d] States the flexibility to set their own reasonable risk ratio thresholds, with input from stakeholders and State Advisory Panels." *Id.* The government explained that "[a]s part of the process of setting risk ratio thresholds, States must work with stakeholders to identify particular risk ratio thresholds that help States and LEAs to address large racial and ethnic disparities without undermining the appropriate implementation of child find procedures." *Id.*

Moreover, the government committed to "monitor States for any use of risk ratio thresholds that may be unreasonable and take steps, as needed, to ensure the States' compliance." *Id.* at 92419. The regulations required "States to report all risk ratio thresholds, minimum cell sizes, minimum n-sizes, standards for measuring reasonable progress, and the rationales for each," and these rationales had to "include a detailed explanation of why the numbers are reasonable and how they ensure appropriate analysis for significant disproportionality." *Id.* at

92460. The government also committed "to publish guidance to help schools to prevent racial discrimination in the identification of children as children with disabilities, including over-identification, under-identification, and delayed identification of disabilities by race." *Id.* at 92397. Finally, the regulations included monitoring of States and LEAs. *Id.* at 92385 ("[T]he Department intends to conduct an evaluation of the implementation of this regulation to assess its impact, if any, on how LEAs identify children with disabilities."). This evaluation would "include an examination of the extent to which school and LEA personnel incorrectly interpret the risk ratio thresholds and implement racial quotas in an attempt to avoid findings of significant disproportionality by States, contrary to IDEA." *Id.* at 92386.

In 2018, the government rejected its prior conclusion that the 2016 Regulations adequately protected against the risk of States using racial quotas to avoid findings of significant disproportionality. However, the government did not explicitly find that the safeguards in the 2016 Regulations *were* insufficient or that the 2016 Regulations *would* result in the use of quotas. Rather, it stated it needed more time to determine whether the regulations "may" incentivize quotas. 83 Fed. Reg. at 31308 ("We want to evaluate whether the numerical thresholds in the 2016 significant disproportionality regulations may incentivize quotas or lead LEAs to artificially reduce the number of children identified as children with disabilities under the IDEA."). Such equivocation pervades the explanation for the Delay Regulation. *See, e.g.,* 83 Fed. Reg. at 31307 ("We are *concerned* the 2016 significant disproportionality regulations *could* result in de facto quotas …."); *id.* at 31308 (Quotas are "precisely the risk[] that the Department *believes* the standard methodology *may* pose."); *id.* ("The Department is *concerned* that the 2016 significant disproportionality regulations *may* create an incentive for LEAs to establish de facto quotas …."); *id.* ("[T]he regulations themselves *may*, in fact, incentivize quotas."); *id.* ("We want

to evaluate whether the numerical thresholds in the 2016 significant disproportionality regulations *may* incentivize quotas ….”); *id.* at 31309 (“*may* result in encouraging quotas”); *id.* at 31311 (“*may* result in de facto quotas”); *id.* at 31312 (“*concerned* that the 2016 significant disproportionality regulations, *potentially* create[] an express or implied incentive for LEAs to set quotas”) (emphasis added to all).

The Delay Regulation either did not address the 2016 Regulations’ safeguards to deter the use of racial quotas or responded to them in an inadequate or cursory manner. The Delay Regulation dismissed the explicit warning in the 2016 Regulations against the use of quotas as “insufficient” to protect “against [LEAs] creating de facto quotas because, regardless of the disclaimer, the regulations themselves may, in fact, incentivize quotas.” 83 Fed. Reg. at 31308. In response to its earlier commitment to provide public guidance and conduct an evaluation of whether States erected quotas in implementing the 2016 Regulations, the government in 2018 stated only that the efficacy of these measures “require[d] careful review, which we will do during this delay.” *Id.* at 31315. The Delay Regulation did not address the other specific safeguards in the 2016 Regulations. Moreover, the safeguards built into the 2016 Regulations were not meant to operate in isolation; they worked together to prevent LEAs from being incentivized to use quotas. In implementing the Delay Regulation, the government failed to explain why the safeguards as a whole would not prevent against the risk of quotas being used by LEAs.

The government did not explain why it had changed its position that the 2016 safeguards would be effective. Instead, it concluded that the 2016 Regulations *could* incentivize the use of quotas—a conclusion that was contrary to and inconsistent with its prior determination. While “[a]gencies are free to change their existing policies,” in doing so they must “provide a reasoned

explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citations omitted). The Supreme Court has explained an agency's obligation when it departs from a prior decision:

> When an agency changes its existing position, it need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate. But the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy. In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account. In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy. It follows that an [u]nexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.

*Id.* at 2125-26 (quotation marks and citations omitted) (alteration in original).

The government's "concerns"—drenched in qualification—about the possibility of incentivizing racial quotas amount to the type of speculation the Supreme Court and the D.C. Circuit have rejected. "Though an agency's predictive judgments about the likely economic effects of a rule are entitled to deference . . . deference to such ... judgment[s] must be based on some logic and evidence, not sheer speculation." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) (quotation marks and citations omitted) (alteration in original). *See also Nat'l Lifeline Ass'n v. FCC*, No. 18-1026, 2018 WL 4154794 (D.C. Cir. Aug. 10, 2018) (per curiam); *Sorenson Commc'ns, Inc.*, 755 F.3d at 708 ("[A]gency action based on speculation rather than evidence is arbitrary and capricious.").

Moreover, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" by providing "a reasoned explanation … for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television Stations, Inc.*, 556 U.S. at 515-16. Again, the government here provides no such

"reasoned explanation." It relies exclusively on data from Texas to justify its change in position regarding the possible use of racial quotas and the adequacy of the safeguards to prevent their use. During a monitoring visit to Texas in February 2017, Department officials "determined that some ISDs [Independent School Districts] took actions specifically designed to decrease the percentage of children identified as children with disabilities under the IDEA to 8.5 percent or below." Texas Part B 2017 Monitoring Visit Letter at 1, AR-001290, ECF No. 28. The report showed that ISDs believed that reducing identification rates below 8.5 percent could result in "less monitoring." *Id.* at 2, AR-001291. This information, the government concluded, was "a clear example of what can happen when schools are required to meet numerical thresholds in conjunction with serving children with disabilities." 83 Fed. Reg. at 31308.

The Texas data proves nothing new. First, it sheds no light on how likely LEAs are to incorrectly identify students *based on their race or ethnicity* to avoid significant disproportionately findings, because, as the government concedes, the Texas example did not involve the use of racial or ethnic quotas. Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment at 19, ECF No. 22 ("Defs.' Cross-Mot. for Summ. J. and Opp'n to Pl.'s Mot. for Summ. J."). As noted, the 2016 Regulations emphasize the danger of legal liability to deter LEAs from utilizing racial quotas. *See* 42 U.S.C. §§ 1983, 1988, 2000d. By contrast, the IDEA does not allow recovery of civil damages. Second, the fact that numerical limitations could incentivize the use of quotas was not new information to the government, which was aware of this risk when drafting the 2016 Regulations, and which included safeguards to prevent the use of quotas. The Texas system did not contain those safeguards.

The insufficiency of the government's explanation for its policy change is highlighted by the fact that, while the government expressed "concern" about using standard methodology incentivizing quota use, the Delay Regulation did not forbid LEAs from using this methodology. Rather, it allowed states to comply voluntarily with the 2016 Regulations during the delay. 83 Fed. Reg. at 31309 ("States may implement the standard methodology or may use any methodology of their choosing to collect and examine data to identify significant disproportionality in their LEAs until the Department evaluates the regulations and issues raised in this rulemaking."). Indeed, the government acknowledged that "many States have commented that they intend to . . . implement the standard methodology in the 2016 significant disproportionality regulations even if the Department delays these regulations." *Id.* at 31312.[9] This inconsistency between the government's purported concern about the risk of using the standard methodology and the government's decision to permit LEAs to use the standard methodology is amplified by the government's decision to allow the use of the standard methodology *without* the 2016 Regulations safeguards designed to deter racial and ethnic quotas.

The government denies any inconsistency. It argues that

ED did not find that the 2016 regulations would *result* in racial quotas, or even that they would *incentivize* racial quotas. Rather, ED simply concluded that the regulations may or potentially could incentivize [districts] to establish quotas. In light of this perceived risk, ED chose not to require nationwide compliance with the standard methodology while it studied the issue. At the same time, it chose not to divest States of the ability to decide for themselves what type of methodology to use.

Defs.' Cross-Mot. for Summ. J. and Opp'n to Pl.'s Mot. for Summ. J. at 28-29 (quotation marks and citations omitted) (emphasis in original) (alteration in original). This explanation merely

---

[9] The government predicted: "20 States will implement the 2016 significant disproportionality regulations on July 1, 2018. We further assume 10 States will implement the standard methodology on July 1, 2019, with the remainder doing so on July 1, 2020, if the standard methodology is required by law then." 83 Fed. Reg. at 31316.

reinforces the point that the government never "even" found that the 2016 Regulations would incentivize the use of racial quotas. *See id.* The inconsistency in the government's argument only serves to show that there was no need for the delay at all, and it renders the Delay Regulation arbitrary and capricious. *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015) ("We have often declined to affirm an agency decision if there are unexplained inconsistencies in the final rule.") (citations omitted).

The government also urges the court to defer to its "predictive judgment" concerning its regulatory actions, "even in the absence of evidence." Defs.' Cross-Mot. for Summ. J. and Opp'n to Pl.'s Mot. for Summ. J. at 20 (quoting *Fox Television Studios, Inc.*, 556 U.S. at 521). The court is hard-pressed to classify the government's many equivocations about the effect of the 2016 Regulations as "predictive judgments." As noted, the government itself emphasizes that it never found "that the 2016 regulations would result in racial quotas, or even that they would incentivize racial quotas . . . [and] simply concluded that the regulations may or potentially could incentivize [districts] to establish quotas." In any event, as the D.C. Circuit has made clear, "[T]hough an agency's predictive judgments about the likely economic effects of a rule are entitled to deference . . . deference to such . . . judgment[s] must be based on some logic and evidence, not sheer speculation." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) (quotations marks and citations omitted).

The government in 2018 likewise failed to adequately explain why it needed to delay the implementation of the 2016 Regulations to further evaluate whether the regulations could incentivize using quotas. This failure also renders the Delay Regulation arbitrary and capricious. As the D.C. Circuit has explained:

> Agencies regularly reconsider rules that are already in effect [and] a decision to reconsider a rule does not simultaneously convey authority to indefinitely delay the

existing rule pending that reconsideration.  Thus, the mere fact of reconsideration, alone, is not a sufficient basis to delay promulgated effective dates specifically chosen by [an agency] on the basis of public input and reasoned explanation.

*Air All. Hous. v. EPA*, 906 F.3d 1049, 1067 (D.C. Cir. 2018) (quotation marks and citations omitted).  In delaying a regulation, an agency must explain "how the effectiveness of the rule would prevent [the agency] from undertaking notice and comment or other tasks for reconsideration, why a delay is necessary to [the agency's] process, or how the [underlying] Rule becoming effective on schedule would otherwise impede [the agency's] ability to reconsider that rule." *Id.* (citation omitted).  *See Pub. Citizen v. Steed*, 733 F.2d 93, 102 (D.C. Cir. 1984) ("Without showing that the old policy is unreasonable, for [the agency] to say that no policy is better than the old policy solely because a new policy *might* be put into place in the indefinite future is as silly as it sounds.") (emphasis in original).

In promulgating the Delay Regulation, the government explained that it was "more prudent to delay the compliance date and address [its] concern through a review of the standard methodology before States are required to implement the regulations rather than during implementation."  83 Fed. Reg. at 31310.  The government contends that this distinguishes the Delay Regulation from *Air All. Houston* because "ED chose postponement pending reevaluation to avoid a specific, undesirable outcome—here, incentivizing the use of de facto quotas—while its study of such issues took place, in contrast to EPA's explanation [in *Air All. Houston*] for delay, which rested on 'the mere fact of reconsideration alone.'"  Defs.' Cross-Mot. for Summ. J. and Opp'n to Pl.'s Mot. for Summ. J. at 21 n.4 (quoting *Air All. Hous. v. EPA*, 906 F.3d at 1067) (comma from *Air All. Houston* omitted in the government's pleading).

The argument is unavailing.  In *Air All. Houston*, the EPA delayed a regulation, pointing to "a specific, undesirable outcome," Defs.' Cross-Mot. for Summ. J. and Opp'n to Pl.'s Mot. for

Summ. J at 21 n.4, namely "security risks and other hypotheticals raised by industry" even though the EPA did not conclude that the underlying rule "would increase such risks." *Air All. Hous. v. EPA*, 906 F.3d at 1065 (quotation marks and citations omitted). The Court of Appeals found that the EPA did not provide a "sufficient basis [for] delay," *id.* at 1067, because it did not explain how implementing the rule would interfere with reconsideration of the rule. *Id.* Here too, the government has not shown that delay is necessary to permit reconsideration of the 2016 Regulations.[10]

### 2. Failure to Consider the Cost was Arbitrary and Capricious

The Delay Regulation is also arbitrary and capricious because the government failed to consider all the relevant factors when considering the cost of the regulation. "Agencies have long treated cost as a centrally relevant factor when deciding whether to regulate. Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (emphasis in original).[11] Courts must be deferential when reviewing "an

---

[10] In its briefing, COPAA addressed several other rationales included in the Delay Regulation. *See* Pl.'s Opp'n to Defs.' Mot. to Dismiss and Pl.'s Mot. for Summ. J.at 32-34. The government neither responded to COPAA's arguments concerning these rationales nor independently advanced them. COPAA therefore argued that the government "abandoned" these reasons as "bases for the delay." Pl.'s Reply Supp. Mot. for Summ. J. and Opp'n to Defs.' Cross-Mot for Summ. J. at 12 n.5. The government did not respond to this abandonment argument in its Reply, and the court deems those arguments abandoned.

[11] The government contended in its Motion for Summary Judgment that because its regulatory impact analysis was conducted pursuant to Executive Orders, it is not subject to judicial review. Defs.' Cross-Mot. for Summ. J. and Opp'n to Pl.'s Mot. for Summ. J. at 29-30. Similarly, it argued that the IDEA does not provide a statutory cause of action to challenge its cost-benefit analysis. *Id.* at 30-31. These arguments are contrary to D.C. Circuit precedent. Because the government relied on its cost-benefit analysis in its Delay Regulation, *see* 83 Fed. Reg. at 31314, a flaw in that analysis can render the regulation arbitrary and capricious. *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039-40 (D.C. Cir. 2012) (explaining that although an agency

agency's cost/benefit analysis," *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 254 (D.C. Cir. 2013), and their review is limited to deciding whether the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment," *Ctr. For Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985). Here, the government failed to adequately account for two relevant factors—the States' reliance cost and the cost of delay on children, parents, and society.

An agency must consider reliance costs when delaying a regulation. "In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quotation marks and citations omitted). As the government concedes, for 18 months—the time between the effective and compliance dates of the 2016 Regulations—States and LEAs incurred costs by coming into compliance with the 2016 Regulations. *See* 83 Fed. Reg. at 31316 (explaining that the costs incurred by States in implementing the standard methodology in reliance on the 2016 Regulations were "expenditures already incurred by entities that cannot be recovered in any case"). The government labels these costs "sunk investments" and explains that "[r]egardless of whether the Department delayed the required compliance date, States would be unable to recover those expenses, and therefore it would not be appropriate to assign their value as either a cost or benefit of this action." *Id.* The government, however, does not explain *why* this would be inappropriate. Under this logic, the requirement to consider reliance costs would become illusory, because an agency could simply

---

may "not have a statutory duty to demonstrate that the benefits of the amended rule outweigh its costs," if the "agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable") (citations omitted). The government did not press this argument in its Reply Brief.

rebrand "reliance costs" as "sunk costs." Tellingly, the government cites no law in support of this proposition.

The Delay Regulation also fails to account for the costs to children, their parents, and society. In promulgating the Delay Regulation, the government identified "five sources of benefits" for children with disabilities, their parents, and society from the 2016 Regulations: "(1) Greater transparency; (2) increased role for the State Advisory Panels; (3) reduction in the use of inappropriate policies, practices, and procedures; (4) increased comparability of data across States; and (5) expansion of activities allowable under comprehensive CEIS." 83 Fed. Reg. at 31315. In so far as the delay in implementation undercuts these benefits, the Delay Regulation imposes costs that must be accounted for. But the government has not fully accounted for these costs. As to the potential losses of the transparency benefit and the increased stakeholder participation, the government claims that the mere preparation for the 2016 Regulations effectively achieve those benefits. *See id.* This argument ignores the fact that "part of the purpose of the standard methodology [was] to foster greater transparency in how States identify significant disproportionality," and that States would adopt "simple and easily interpreted analyses" when identifying LEAs with significant disproportionality. 81 Fed. Reg. at 92404. This is a loss for which the government does not account. Similarly, the government fails to explain how preparation for stakeholders' expanded involvement would also have occurred if compliance with the standard methodology were required.

## IV. REMEDY

The D.C. Circuit has stated that "vacatur is the normal remedy" for an APA violation. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). The APA "itself contemplates vacatur as the usual remedy when an agency fails to provide a reasoned

explanation for its regulations. 5 U.S.C. § 706(2)(A) ('The reviewing court *shall . . .* hold unlawful *and set aside* agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . .'" *AARP v. U.S. Equal Emp't Opportunity Comm'n*, 292 F. Supp. 3d 238, 242 (D.D.C. 2017) (emphasis in original). The presumption of vacatur, "however, is not absolute, and a remand without vacatur may be 'appropriate [if] "there is at least a serious possibility that the [agency] will be able to substantiate its decision' given an opportunity to do so, and when vacating would be 'disruptive.'"'" *Bauer v. DeVos*, 332 F. Supp. 3d 181, 184 (D.D.C. 2018) (quoting *Radio-Television News Dirs. Ass'n v. FCC*, 184 F.3d 872, 888 (D.C. Cir. 1999)) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993)) (alterations in original). "Courts in this Circuit . . . have long recognized that 'when equity demands, an unlawfully promulgated regulation can be left in place while the agency provides the proper procedural remedy.'" *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 267 (D.D.C. 2015) (quoting *Fertilizer Inst. v. EPA,* 935 F.2d 1303, 1312 (D.C. Cir. 1991) (citation omitted) (footnote omitted).

Whether to remand without vacatur "depends on the 'seriousness of the order's deficiencies' and the likely 'disruptive consequences' of vacatur." *Allina Health Servs.*, 746 F.3d at 1110 (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,* 988 F.2d 146, 150-51 (D.C. Cir. 1993)). As discussed above, the government's deficiencies were substantial, and the court finds it unlikely that the government could justify its decision on remand. The government stresses that if the court remanded without vacatur, it would be able to "provide a more fulsome explanation of what occurred in Texas, the lessons it took from that experience, and the reasons why the conclusions it drew from that example support the action it took in the

2018 Final Rule." Defs.' Cross-Mot. for Summ. J. and Opp'n to Pl.'s Mot. for Summ. J. at 44. However, this court has already found the Texas example provides no evidence of whether the 2016 Regulations incentivize LEAs to use racial quotas, and the government has not been able to explain how, on remand, it could extract more useful information from the Texas study than it was able to do during its rulemaking and in its summary judgment pleadings. "To the extent the Secretary bears the burden of demonstrating that the 'normal remedy' of vacatur does not apply, *Allina Health Servs.,* 746 F.3d at 1110, [the government] has failed to show that the flaw in the rule was not serious." *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 268 (D.D.C. 2015).

The court must also consider the second *Allied-Signal* factor—the disruptive consequences—of vacating the Delay Regulation. The government argues that vacatur "*could be* extremely disruptive." Defs.' Cross-Mot. for Summ. J. and Opp'n to Pl.'s Mot. for Summ. J. at 44 (emphasis added). But the suggestion that States were unprepared to comply with the 2016 Regulations is not supported by the record and inconsistent with the fact that for eighteen months between the effective date of the 2016 Regulations and the compliance date, States were preparing to utilize the standard methodology. And as noted earlier, the Delay Regulation rulemaking record showed that even if the government decided to delay the 2016 Regulations, many States planned to use the standard methodology. 83 Fed. Reg. at 31312 ("The Department notes that, in any event, States may, and many States have commented that they intend to, implement the standard methodology in the 2016 significant disproportionality regulations even if the Department delays these regulations."). Moreover, the government's contention that States *might* have to shift funding in the middle of the school year, Defs.' Reply in Supp. Mot. for Summ. J. at 25, is both speculative and without support in the record.

In weighing the two *Allied-Signal* factors, the court finds that they both favor vacatur as the appropriate remedy. Moreover, ordering vacatur for the illegal delay of a legal regulation differs from ordering vacatur of a new rule on a clean slate. "This is not a case in which 'the egg has been scrambled and there is no apparent way to restore the status quo ante.' Rather, vacating the Delay Rule would simply allow the [the original rule] to take effect, as the agency originally intended." *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 21 (D.D.C. 2017) (quoting *Sugar Cane Growers Co-op of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002)). To order remand without vacatur "would simply remedy the agency's delay with more delay." *Id.* Considering this court's findings above, and the weighing of the *Allied-Signal* factors, the appropriate remedy is vacatur.

## V. CONCLUSION

The court hereby **DENIES** Defendants' Motion to Dismiss, ECF No. 14; **GRANTS** Plaintiff's Motion for Summary Judgment, ECF No. 16; **DENIES** Defendants' Cross-Motion for Summary Judgment, ECF No. 22; and **VACATES** "the Delay Regulation," Assistance to States for the Education of Children With Disabilities; Preschool Grants for Children With Disabilities, 83 Fed. Reg. 31306 (July 3, 2018).

An appropriate Order will accompany this Memorandum Opinion.

Date: March 7, 2019

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge